392 F.2d 9
 W. R. GRACE & CO., Plaintiff-Appellant,
v.
Clyde C. HARGADINE, Defendant-Appellee.
W. R. GRACE & CO., Plaintiff-Appellant,
v.
INTERCONTINENTAL CHEMICAL CORPORATION and Universal Chemicals, Inc., Defendants-Appellants.
W. R. GRACE & CO., Plaintiff-Appellant,
v.
Clyde C. HARGADINE, Intercontinental Chemical Corporation and Universal Chemicals, Inc., Defendants-Appellees.
 Nos. 17518-17520.
 United States Court of Appeals Sixth Circuit.
 March 27, 1968.
 
 COPYRIGHT MATERIAL OMITTED Thomas D. Heekin, and Robert T. Keeler, Cincinnati, Ohio, for W. R. Grace & Co.; Robert T. Keeler, Cincinnati, Ohio, on brief; Taft, Stettinius & Hollister, Cincinnati, Ohio, of counsel.
 John S. Stith and James G. Headley, Cincinnati, Ohio, for Clyde C. Hargadine-Intercontinental Chemical Corporation and Universal Chemicals, Inc.; Frost & Jacobs, Cincinnati, Ohio, of counsel.
 Before O'SULLIVAN, EDWARDS and COMBS, Circuit Judges.
 EDWARDS, Circuit Judge.
 
 
 1
 These appeals record the bitter struggle which ensued when one industrial giant (W. R. Grace & Co.) sought first to merge with and then to purchase all the assets of another company (DuBois Chemicals, Inc.). The merger was defeated by the fact that two-thirds of DuBois' stockholders failed to approve it. The purchase was finally accomplished with the approval of a majority of the stockholders of DuBois.
 
 
 2
 But the purchase of all assets of DuBois for approximately $76,000,000 was completed over the bitter opposition of the Executive Vice President and General Manager of DuBois (Clyde C. Hargadine) and an important minority of DuBois' directors, stockholders and employees. The dissenting minority of officers and employees then established an operating company (Universal Chemicals, Inc.) and a sales company (Intercontinental Chemical Corporation) to compete generally in the same industrial chemical fields in which DuBois had previously operated and was continuing to operate as a division of W. R. Grace & Co.
 
 
 3
 Grace then brought suit in the United States District Court for the Southern District of Ohio against Hargadine and the two new companies, Universal and Intercontinental. Jurisdiction was founded upon diversity of citizenship.
 
 
 4
 The complaint, filed in three counts, alleged three different although closely related causes of action.
 
 
 5
 The principal claim alleged that defendants, Universal, Intercontinental and Hargadine, conspired to and did unlawfully appropriate trade secrets and customer information previously the property of DuBois. Plaintiff sought compensatory and punitive damages, and injunctive relief from defendants' continued use of the information and formulas claimed to have been unlawfully appropriated.
 
 
 6
 Another count alleged that the same defendants unlawfully induced some of plaintiff's employees to breach employment contracts in order to go to work for defendant companies in competition with plaintiff.
 
 
 7
 The third count alleged that Hargadine personally breached a covenant not to compete which he had once signed with a predecessor company to DuBois Chemicals, Inc., and to which covenant plaintiff Grace claimed it acquired full rights.
 
 
 8
 The case was tried for over a month before a United States District Judge and a jury in the Western Division of the Southern District of Ohio.
 
 
 9
 The breach of covenant claim against Hargadine was decided in favor of Hargadine by the District Judge on cross-motions for summary judgment. The balance of Grace's claims against the defendants were submitted to the jury on special questions and decided as indicated below:
 
 
 10
 Inducement of Employees — The jury was unable to agree as to defendants Hargadine and Intercontinental. As to defendant Universal, it found no cause for action.
 
 
 11
 Illegal Appropriation of Trade Secrets — The jury found for plaintiff against defendant Universal; was unable to agree on a verdict as to defendant Hargadine, and found no cause for action as to defendant Intercontinental.
 
 
 12
 Illegal Appropriation of Customer Information — The jury found for plaintiff against defendant Intercontinental and found no cause for action against defendants Hargadine and Universal.
 
 
 13
 A separate trial was held on the issue of damages to be awarded plaintiff Grace against defendants Universal and Intercontinental on the verdicts against them. The jury awarded plaintiff $240,000 compensatory damages and $95,000 punitive damages. The District Judge also entered an injunction forbidding Universal and Intercontinental from any continued use of the trade secret formulas or customer lists and requiring turnover of such documents. Following the jury verdicts the District Judge also granted defendants' motions to dismiss in relation to the appropriation of the trade secrets claim against Hargadine and the inducement issue against Intercontinental and Hargadine, holding that the evidence adduced at trial was insufficient to establish liability as to those counts and those defendants.
 
 
 14
 The three appeals styled and numbered above followed. A one sentence summary of the appellate posture might be that each party who lost on any issue appealed.
 
 
 15
 The contending parties press their assertions of error in fact and law upon us with much vigor. We shall deal with the appellate issues under four headings: The Damage Awards; The Directed Verdicts; The Hargadine Covenant, and Subsidiary Issues.
 
 The Damage Awards
 
 16
 The competitive relationship between the contending parties is conceded. No appeal is taken as to the amount of damage. A pretrial stipulation recited these agreed facts:
 
 
 17
 "The plaintiff is engaged in manufacturing and selling specialized cleaning and processing compounds to industrial and institutional customers, principally manufacturing plants, hospitals, meat packers, dairies, hotels, restaurants, and the transportation industry, and is also engaged in the manufacture of and sale of chemicals and in the transportation of petroleum, agricultural and food processing products in the United States, and elsewhere.
 
 
 18
 "The defendant Intercontinental is engaged in the business of marketing and selling commercial soaps and detergents in competition with plaintiff.
 
 
 19
 "The defendant Universal Chemicals, Inc., is authorized to do business in the State of California. On September 16, 1964, it acquired ownership of the assets of Continental Chemical Company, located in Sacramento, California, and since that date defendant Universal has been manufacturing commercial soaps and detergents for sale to defendant Intercontinental, and others.
 
 
 20
 "The defendants, and those acting in concert with them, are actively engaged in the manufacture, sale and distribution of commercial and industrial soaps and detergents substantially competitive with those produced by plaintiff.
 
 
 21
 "The defendant Mr. Hargadine and his associates caused the defendant X.Y.Z., now known as Universal, to be organized July 9, 1964 for the purpose of manufacturing and marketing said competitive products, and the defendant Mr. Hargadine caused Intercontinental to be organized August 12, 1964 for the purpose of manufacturing and marketing said competitive products, although Intercontinental does no manufacturing of competitive products."
 
 
 22
 These incorporation dates cited above were approximately two and three months, respectively, after the sale of DuBois' assets to Grace, which had been consummated on May 6, 1964. And the principal incorporators, officers and salesmen for the two new companies were the former officers and salesmen of DuBois Chemicals, Inc., who had opposed first the merger and then the sale.
 
 
 23
 Conceding all of this, appellants Universal and Intercontinental contend, however, that they did nothing illegal. They argue that the jury damage awards against them must be set aside because there is no substantial proof that they illegally appropriated any of plaintiff's protectable trade secrets or customer information.
 
 
 24
 Since this case is brought under federal diversity jurisdiction and the alleged misappropriations took place principally in Ohio, we start with appellant's own trade secret tests drawn from Ohio law. In Cincinnati Bell Foundry Co. v. Dodds, 10 Ohio Dec.Rep. 154, 19 Weekly L. Bull. 84 (Super.Ct. 1887), Judge William Howard Taft provided this classic if simplified test:
 
 
 25
 "1st. Was the process a secret one?
 
 
 26
 "2d. Did John B. Dodds acquire knowledge of it in confidence, and under an implied obligation not to use or disclose it?" Cincinnati Bell Foundry Co. v. Dodds, supra at 156.
 
 
 27
 In discussing the facts from this lengthy record, appellee emphasizes primarily those which tend to establish defendants' obligation not to disclose, while appellants emphasize primarily those portions of the record which tend to reflect DuBois' lack of secrecy.
 
 
 28
 We believe that the proofs of important violations by agents of defendants of previously existing confidential relationships are overwhelming. Hargadine, himself, had been both Executive Vice President and General Manager of DuBois Chemicals, Inc. As such he had obvious access to all of the most important information upon which DuBois had built its undisputed success as the "Tiffany of the trade." If he did not himself have the product formulas and detailed customer information, he knew who did.
 
 
 29
 Dr. Edward B. Tooper was Vice President in Charge of Research and Development for DuBois Chemicals, Inc. He joined forces wth Hargadine and the group of ex-DuBois employees on July 30, 1964 — the day after severing his relationship with DuBois. He brought to the meeting with him notes of 150 of the DuBois formulas. There is repeated testimony that Hargadine in urging DuBois personnel to join the new venture referred frequently to the fact that "we have the DuBois formulas."
 
 
 30
 Joining in the July 29-30 meeting, and others which resulted in the foundation of the two defendant companies, were a considerable number of former DuBois salesmen and sales managers. Many of them, according to undisputed testimony, retained DuBois customer books and DuBois customer service information materials when they left DuBois and went with defendants.
 
 
 31
 This record certainly contains substantial evidence from which the jury could have found breach of trust. While such abuse does not represent the entire proof necessary to establish plaintiff's case, it is, as Mr. Justice Holmes pointed out, the starting point:
 
 
 32
 "The word `property' as applied to trade-marks and trade secrets is an unanalyzed expression of certain secondary consequences of the primary fact that the law makes some rudimentary requirements of good faith. Whether the plaintiffs have any valuable secret or not the defendant knows the facts, whatever they are, through a special confidence that he accepted. The property may be denied but the confidence cannot be. Therefore the starting point for the present matter is not property or due process of law, but that the defendant stood in confidential relations with the plaintiffs, or one of them." E. I. du Pont de Nemours Powder Co. v. Masland, 244 U.S. 100, 102, 37 S.Ct. 575, 576, 61 L.Ed. 1016 (1917).
 
 
 33
 Breach of confidence is the essence of the basic definition of trade secret liability in ALI's Restatement of Torts § 757 (1939):
 
 
 34
 "One who discloses or uses another's trade secret, without a privilege to do so, is liable to the other if
 
 
 35
 "(a) he discovered the secret by improper means, or
 
 
 36
 "(b) his disclosure or use constitutes a breach of confidence reposed in him by the other in disclosing the secret to him, or * * *"
 
 
 37
 And similar principles are recognized in the leading Ohio Supreme Court case:
 
 
 38
 "The authorities are quite uniform that disclosures of trade secrets by an employee secured by him in the course of confidential employment will be restrained by the process of injunction, and in numerous instances attempts to use for himself or for a new employer information relative to the trade or business in which he had been engaged, such as lists of customers regarded as confidential, have been restrained." Curry v. Marquart, 133 Ohio St. 77, 79, 11 N.E.2d 868, 869 (1937).[1]
 
 
 39
 Appellants' principal argument, however, is that none of the formulas or customer information which their agents appropriated from DuBois was "secret." They argue that none of the DuBois formulas were "novel," but in fact were mere combinations of well known chemicals which were well known in the trade.
 
 
 40
 There is, however, much contrary testimony. An Executive Vice President of DuBois testified that in the five years prior to the Grace purchase, DuBois spent a million dollars on research and development of its products.
 
 
 41
 DuBois maintained a laboratory with a staff of approximately 25 people. The record is replete with testimony as to experimentations with chemical formulas designed to perform specific jobs for specific customers. Frequently DuBois formulas were developed to meet particularized problems which customers presented to DuBois salesmen.
 
 
 42
 Further, novelty in the sense it is used in patent law is clearly not a requirement of a trade secret. A. O. Smith Corp. v. Petroleum Iron Works Co., 73 F.2d 531 (6th Cir. 1934), modified to increase scope of injunction, 74 F.2d 934 (1935). In Restatement of Torts § 757, comment b, at 7 (1939), we find this language:
 
 
 43
 "The patent monopoly is a reward to the inventor. But such is not the case with a trade secret. Its protection is not based on a policy of rewarding or otherwise encouraging the development of secret processes or devices. The protection is merely against breach of faith and reprehensible means of learning another's secret. For this limited protection it is not appropriate to require also the kind of novelty and invention which is a requisite of patentability."
 
 
 44
 Defendants also point to a great deal of evidence which may be regarded as proof of laxity in security precautions on the part of DuBois prior to the Grace purchase, and they tender and rely on proofs that after the acquisition, Grace substantially tightened such precautions. On the other hand, there is much plaintiff evidence that DuBois did regard its formulas as distinctive, valuable, and secret and took precautions to protect them. As we view this record, the testimony presented a conflict of evidence on the trade secrets issue which was appropriate for jury resolution. If there were doubt about the adequacy of the evidence on the trade secrets issue, we believe the testimony of Dr. Tooper removes it:
 
 
 45
 "Q. Now, handing to you what has been marked as Plaintiff's Exhibit 1, will you tell me what this booklet is?
 
 
 46
 "A. Well, it consists of two parts. One is what was known as a special products price book, which included equipment and certain products that were in limited production for DuBois.
 
 
 47
 "Mr. Keeler: I would like the record to show that included in Exhibit 1, which was identified by the witness, are 158 of the loose DuBois price sheets, around which I have put a rubber band at this time.
 
 
 48
 "Q. Dr. Tooper, when you went to Chicago on July 30, 1964, did you have Exhibit 1 with you?
 
 
 49
 "A. Yes.
 
 
 50
 "Q. Including these DuBois — these single looseleaf DuBois price sheets?
 
 
 51
 "A. Yes.
 
 
 52
 "Q. Or were they in a binder at that time?
 
 
 53
 "A. I do not recall.
 
 
 54
 "Q. But you did have them with you?
 
 
 55
 "A. Yes.
 
 
 56
 "Q. Can you tell me the purpose of taking these with you? I refer now to Exhibit 1, and the loose price sheets.
 
 
 57
 "A. Yes, I used them for reference in setting up certain of the XYZ formulas.
 
 
 58
 "Q. When you say `setting up certain of the XYZ formulas,' are you referring to formulations that you put on formula sheets when you were at the Americana Motel in Chicago on July 30 and 31, and August 1, is that right?
 
 
 59
 "A. Yes.
 
 
 60
 "Q. And these are the same formula sheets, copies of which you turned over to Mr. Mailfald?
 
 
 61
 "A. Yes.
 
 
 62
 "Q. And perhaps some to Mr. Lichtenberg, too?
 
 
 63
 "A. Perhaps, yes.
 
 
 64
 "Q. Did you have any other written material with you, Dr. Tooper, when you were setting up these formulations?
 
 
 65
 "A. Not that I recall."
 
 
 66
 This record makes clear that in the week following July 30, 1964, the competitive enterprise contemplated by Hargadine, Tooper and their associated was indeed launched. Tooper supplied over that weekend approximately 50 formulas for the manufacture of products directly competitive with those of the DuBois Division of Grace. These formulas were sent to the two manufacturers referred to in Dr. Tooper's testimony above, and with the resulting products available, the XYZ Corporation within one week was supplying products to former DuBois Chemicals, Inc., customers. The jury had a right to believe from expert testimony that these products were identical for all practical purposes with the DuBois products and that no such successful entry into this competitive enterprise could have been achieved absent the DuBois formulas.
 
 
 67
 Much the same may be said about the second issue upon which the $240,000 compensatory verdict is based. Customer information and customer lists are traditionally regarded as valuable property of any sales company. In Briggs v. Butler, 140 Ohio St. 499, 509, 45 N.E. 2d 757, 762 (1942), the court said:
 
 
 68
 "The fact that in the operation of a business the public may learn methods, systems and trade usages does not make such methods public property and consequently deprive an employer of any protection. Lists of customers have always been protected in equity, notwithstanding that any person who troubled to follow the salesman could compile a reasonably correct list of his customers."
 
 
 69
 Here salesmen who left DuBois (and went into competition with it immediately thereafter), retained in their possession DuBois customer books and customer service information materials. These materials clearly belonged to DuBois and were part of the assets for which Grace paid $76,000,000. While defendants in effect argue that the industrial customers for such products as detergents and paint removers are obvious, it is certainly true that the particular problems of particular industries and the tailor-made solutions found for them by DuBois are not. The jury verdict as to compensatory damages rests on substantial evidence.
 
 
 70
 Consideration of the jury award of $95,000 of punitive damages requires other references to this record. The law of Ohio provides for exemplary or punitive damages. Saberton v. Greenwald, 146 Ohio St. 414, 66 N.E.2d 224, 165 A. L.R. 599 (1946); Roberts v. Mason, 10 Ohio St. 277 (1859); 16 Ohio Jur.2d, Damages § 145 (1955).
 
 
 71
 In Roberts v. Mason, supra, the first headnote states the fundamental Ohio law:
 
 
 72
 "In an action to recover damages for a tort which involves the ingredients of fraud, malice, or insult, a jury may go beyond the rule of mere compensation to the party aggrieved, and award exemplary or punitive damages; * * *"
 
 
 73
 In Aladdin Mfg. Co. v. Mantle Lamp Co., 116 F.2d 708, 716-717 (7th Cir. 1941), the court said:
 
 
 74
 "Exemplary damages are allowed against a tort feasor whose acts are intentionally fraudulent, malicious, wilful or wanton. They have always been recoverable at common law. Scott v. Donald, 165 U.S. 58, 17 S.Ct. 265, 41 L.Ed. 632."
 
 
 75
 The punitive damage award here is supported by the record we have cited, plus much additional evidence. Ray Fronberry testified concerning the May 14, 1964, meeting in Covington, Kentucky:
 
 
 76
 "Also at the meeting Mr. Hargadine mentioned that Dr. Tooper, the vice-president in charge of manufacturing, research and development for the DuBois Company, was going to go along with us, and that he was in the process of modifying the DuBois formulas so that there wouldn't be any possible infringement after we went into production.
 
 
 77
 "He also mentioned that he had the confidential sales figures through the month of February."
 
 He also testified:
 
 78
 "Q. Mr. Fronberry, did Mr. Hargadine say anything else to you men before the meeting closed?
 
 
 79
 "A. Yes, he reminded us of the extreme secrecy that we had to operate, that had to prevail, and told us that — to `lie through our teeth' if we had to to retain — and remain secret in all of our activities."
 
 
 80
 Another witness testified that Hargadine told him:
 
 
 81
 "The Witness: That — well, that Mr. Mount was an alcoholic, and Charlie had trouble with wives, and had mistresses, and kept women, and that sort of thing."
 
 
 82
 It is clear that these references are as to Charles DuBois, President of DuBois Chemicals, Inc., and one of the sales executives of DuBois Chemicals. While such assertions have no other support in this record, the testimony cited is such as to indicate malice if the jury chose to believe it was said.
 
 
 83
 There was additional testimony that other of Hargadine's associates in the proposed venture said "Mr. DuBois is selling us down the river" and that the new companies would "knock one hell of a big hole in the DuBois business" and "put DuBois out of business." The elements of secrecy and the vindictiveness which are brought into the picture by this testimony and other evidence of this variety justified the submission of the punitive damage issue and the award made by the jury.
 
 
 84
 We do not decide these fact disputes de novo, but there being substantial evidence to support them, we affirm the jury verdicts for compensatory and punitive damages.
 
 The Directed Verdicts
 
 85
 The second appeal we deal with involves plaintiff Grace's contention that it is entitled to a new trial against defendants Hargadine and Intercontinental on the issue of inducement of previous employees of DuBois Chemicals, Inc., to breach their employment contracts. The jury found no cause for action on this issue as to defendant Universal, but was unable to agree on a verdict as to the other two defendants, whereupon the District Judge granted defendants' motions to dismiss.
 
 
 86
 Here we affirm the District Judge's judgment with less reason for protracted analysis. The record as we read it established two factual defenses and one equitable defense which required dismissal.
 
 
 87
 First in point of fact, the undisputed record shows that each allegedly "induced" employee of DuBois was actually discharged by Grace.
 
 
 88
 Second, the undisputed record also shows that Grace was itself so dissatisfied with the efficacy of the employee contracts (as to which it alleges defendants' inducements occasioned breach) that it refused to continue to operate under them and demanded that its employees sign new ones on pain of discharge.
 
 
 89
 Third, as we read this record, the real complaint about defendants on this issue is that by contact with plaintiff's employees prior to their discharge, defendants sought to and in some instances did involve them in the formation of companies competitive to their employer at a time when any such activity represented a breach of faith on their part. But this is the essence of the cause of action stated in plaintiff's first count on which we have just affirmed damage awards. We see no way (and doubtless neither did the District Judge) by which if there were a retrial, damages on the inducement issue could be determined separately from the action for illegal appropriation of trade secrets and customer information. And certainly if retrial of the inducement cases should be ordered, the damage verdicts which we have just affirmed would have to be set aside lest plaintiff recover twice for essentially the same allegations of unfair conduct.
 
 
 90
 Probably the most difficult problem in these appeals is that posed by the District Judge's entry of judgment for defendant Hargadine on the merits. As we have indicated, Hargadine was the leading figure in the establishment of the competitive companies and there is at least the implication available that he knew of the appropriation of formulas. Yet on this question the jury disagreed as to Hargadine while finding against defendant Universal. Since the record shows Hargadine to be one of the principal stockholders of Universal (and of Intercontinental), it is likely that some members of the jury considered this fact in arriving at the verdict they entered.
 
 
 91
 Waiting until after there had been a subsequent jury trial of the amount of compensatory and punitive damages, appellant Grace moved for judgment n. o. v. to be entered against defendant Hargadine or in the alternative for a new trial as to him.
 
 
 92
 Like the District Judge, we do not think the evidence against Hargadine was so clear that reasonable minds could not disagree. In point of fact, the jury did disagree. As to appellant Grace's motion for judgment n. o. v., we have no hesitancy in affirming the denial by the District Judge.
 
 
 93
 Appellant Grace's alternative motion for new trial as to this same issue poses another problem, however.
 
 
 94
 As our previous recital of this record indicates, there was a great deal of evidence pertaining to Hargadine's activities in relation to appropriation and use of plaintiff Grace's secret chemical formulas. We feel such evidence was adequate to present an issue for jury consideration. This finding requires us to set aside the judgment in favor of Hargadine as to this issue and to remand this issue to the District Court.
 
 
 95
 Under the distinctive facts of this case, however, there may be no need for any further proceedings in this matter. Plaintiff-appellant Grace has in our view had an opportunity to prove all of its damages[2] on this issue and we have affirmed judgments therefor against defendants Universal and Intercontinental.
 
 
 96
 If the judgments we have affirmed against Universal and Intercontinental become final and are paid in full, defendant Hargadine is discharged. The plaintiff clearly is entitled to only one satisfaction of its damage claims on the trade secrets issue. Assuming, however, that the judgments previously affirmed against Universal and Intercontinental become final but are not collected, then and only then a new trial against defendant Hargadine may be required.
 
 The Hargadine Covenant
 
 97
 The third appeal presents plaintiff Grace's contention that the District Judge erred in granting summary judgment in favor of defendant Hargadine in relation to plaintiff's count alleging that Hargadine breached a personal covenant not to compete. The parties had submitted this count on cross-motions for summary judgment.
 
 
 98
 This issue requires the statement of added background facts which are supplied by the pretrial stipulation:
 
 
 99
 "(s) That on October 8, 1958, certain shareholders of DuBois Holding Company, a Delaware corporation, and the owner of all the outstanding stock of DuBois Co., Inc., a California corporation, entered into a written contract with Hall-Scott, Incorporated, a Delaware corporation, wherein said shareholders agree [sic] to sell and Hall-Scott Incorporated agreed to buy, certain shares of capital stock of the DuBois Holding Company. Among said shareholders who entered into and signed said contract was the defendant Mr. Hargadine. Sec. 14 of said contract provides as follows:
 
 
 100
 "`Section 14. Covenants of Stockholders Not to Compete
 
 
 101
 "`14.1 As an inducement to Hall-Scott to purchase stock of the Company (The DuBois Holding Company, a Delaware corporation) hereunder and in consideration thereof, each of the Stockholders who is now an employee of DuBois (The DuBois Co., Inc., a California corporation), including any such Stockholder who becomes a party to this agreement pursuant to Section 4, covenants and agrees that for a period of 2 years after the termination of his employment with DuBois or the Company he will not, directly or indirectly, engage in the business of manufacturing or selling industrial or commercial soaps and detergents, either as an individual, proprietor, partner, stockholder, employee, agent or in any other manner or capacity whatsoever in any of the states of the United States.
 
 
 102
 "`14.2 Each Stockholder acknowledges that the price paid by Hall-Scott for the stock of the Company reflects the value of the good will of DuBois and that such good will is based primarily on the knowledge of the Stockholders and of other employees of DuBois of its methods of manufacturing, selling, and distributing and of the identity of its customers and their requirements for such products; and that DuBois, the Company and Hall-Scott as a stockholder thereof will be irreparably damaged if the Stockholder should compete in any State or becomes an employee of or associated with any business that competes. Accordingly, in the event of a breach by the Stockholder of Section 14.1 the Stockholder agrees and consents that a permanent injunction may be entered enjoining him from continuing such breach during the two years after termination of his employment with DuBois or the Company.
 
 
 103
 "`14.3 Each Stockholder's agreement and covenant in Section 14.1 are for the benefit of DuBois, the Company and any successor company of either, including any corporation into which DuBois or the Company may be merged or with which it may be consolidated or to which either or both of them may transfer substantially all its or their assets and business, and such agreement and covenant may be enforced in any appropriate proceeding by the Company, DuBois or any such successor corporation or any one of them, and such proceeding may be brought in the name of such party.'
 
 
 104
 "(t) Hall-Scott, Incorporated, thereafter purchased for cash said shares of stock, which included 4,000 shares of stock owned by defendant Mr. Hargadine.
 
 
 105
 "(u) In 1960 said DuBois Holding Company, a Delaware corporation, Hall-Scott, Incorporated, and the DuBois Co., Inc., a California corporation, merged into DuBois Chemicals, Inc., pursuant to an agreement of merger, whereby the defendant Mr. Hargadine became vice-president and a member of the board of directors of DuBois Chemicals, Inc.,
 
 
 106
 "(v) That defendant Hargadine's employment as an officer of DuBois Chemicals, Inc., terminated on October 1, 1963."
 
 
 107
 The District Judge construed paragraph 14.1 literally and held that Hargadine's employment contract applied only to DuBois Holding Company, or the DuBois Co., Inc., and terminated when those companies went out of existence in 1960 when they merged into DuBois Chemicals, Inc. He held that section 14.3 should be interpreted as obligating Hargadine not to compete with successor companies (in this instance DuBois Chemicals, Inc.) but only for two years from and after the termination of his employment with the original signatory companies. The District Judge found:
 
 
 108
 "The termination of Mr. Hargadine's employment within the purview of the * * * noncompetitive covenant of October 8, 1958 occurred on April 29, 1960, when the existence of his employer, the DuBois Co., Inc., ceased under the specific terms of the agreement of merger which resulted in the formation of DuBois Chemicals, Inc."
 
 He concluded:
 
 109
 "His new employer had a right to enforce the restrictive covenant against Mr. Hargadine at any time up to and including April 29, 1962. Thereafter, no right remained in anyone to enforce this covenant which Mr. Hargadine had made; and the plaintiff Grace, of course, acquired no such right of enforcement of the covenant." It should be noted that the covenant upon which plaintiff Grace now relies was negotiated in 1958 at the insistence of Hall-Scott, Incorporated, when that company was engaged in investing in DuBois stock. Grace, of course, supplied none of the original consideration for the covenants; nor were the covenants even mentioned in the Grace-DuBois purchase documents so far as this record discloses.
 
 
 110
 It may also be pertinent to note that no attempt to enforce this covenant after April 29, 1962, is shown as to any former DuBois employee except Hargadine.
 
 
 111
 While we recognize that the interpretation relied upon by the District Judge is a quite literal one, we believe that the law favors strict construction of contracts containing covenants not to compete. 5 S. Williston, Contracts § 1636 (rev.ed.1937); Arthur Murray Dance Studios v. Witter, Ohio Com.Pl., 105 N. E.2d 685, 62 Ohio L.Abs. 17 (C.P. Cuyahoga County 1952). See also Restatement of Contracts §§ 236(f), 515 (1932).
 
 
 112
 There is a great deal of authority to support the proposition that a covenant not to compete is not assignable without the consent of the employee. Chapin v. Longworth, 31 Ohio St. 421 (1877); Pestel Milk Co. v. Model Dairy Prods. Co., Ohio App., 52 N.E.2d 651, 39 Ohio L.Abs. 197 (Ct.App.1943); 3 S. Williston, Contracts §§ 412, 421 (3d ed.1960). See also Arkansas Valley Smelting Co. v. Belden Mining Co., 127 U.S. 379, 8 S. Ct. 1308, 32 L.Ed. 246 (1888).
 
 
 113
 Here such an assignment would have to be supplied by implication under the facts of this case and the language of this contract. We, like the District Judge, decline to supply the missing language.
 
 Miscellaneous Issues
 
 114
 We find no merit to the other issues presented to us. No party to this litigation prevailed completely. In such a situation costs and legal fees rest largely in the discretion of the District Judge.
 
 
 115
 We find no abuse of judicial discretion in this record as to these issues.
 
 
 116
 Nor do we find any abuse of discretion in the court order providing for the clerk to send copies of the judgment to defendants' customers or in its failure to prohibit defendants future solicitation of customers claimed by plaintiff Grace. While it is clear that the proposed recipients are not parties to this litigation, their being informed of the result in no way prejudices them and may help to right the balance which defendants' breach of confidence helped to disturb. And defendants have an undoubted right to compete against plaintiff Grace so long as they do not use Grace's assets in doing so. The Supreme Court has described the equity powers of the court in this broad language:
 
 
 117
 "The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it. The qualities of mercy and practicality have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims." Hecht Co. v. Bowles, 321 U.S. 321, 329-330, 64 S.Ct. 587, 592, 88 L.Ed. 754 (1944).
 
 
 118
 Nor do we find any merit to defendants' argument against enforcement measures as to the District Court's preliminary protective order. This order has in all relevant respects been supplanted by the permanent injunction which we have just affirmed. But the question of whether or not it was violated at an earlier stage (and if so the devising of penalty therefor) remains within the inherent power of the court which entered it. United States v. Shipp, 203 U.S. 563, 27 S.Ct. 165, 51 L.Ed. 319 (1906); United States v. United Mine Workers, 330 U.S. 258, 293, 67 S.Ct. 677, 91 L.Ed. 884 (1947).
 
 
 119
 In final summation as to all three appeals, we conclude that these parties have had a long day in court, with fair consideration of their problems by both judge and jury.
 
 
 120
 The judgments complained of are in all respects, except one, affirmed.
 
 
 
 Notes:
 
 
 [1]
 See also B. F. Goodrich Co. v. Wohlgemuth, 117 Ohio App. 493, 192 N.E.2d 99 (1963); 52 Ohio Jur.2d, Trade Secrets §§ 1-4 (1962); 37 Ohio Rev.Code Ann. § 3715.52(M) (Supp.1966); 13 Ohio Rev. Code Ann. § 1333.51 (1967 Current Service) (effective Nov. 14, 1967)
 
 
 [2]
 Ohio law indicates that compensatory damages against joint tortfeasors are joint. But there are some case which state that punitive damages may be awarded by a jury against some but not all tortfeasors, depending upon the malice actually found. Mauk v. Brundage, 68 Ohio St. 89, 67 N.E. 152, 62 L.R.A. 477 (1903); Smithhisler v. Dutter, 157 Ohio St. 454, 460, 105 N.E.2d 868 (1952). This might imply a right to a new trial as to punitive damages only against Hargardine even if the full awards against Universal and Intercontinental were paid. This possibility, however, runs afoul of the basic proposition that there can be no recovery of punitive damages unless there has first been a compensatory damage award. Richard v. Hunter, 151 Ohio St. 185, 85 N.E.2d 109 (1949). It also would, in our judgment, (unless retrial as to all defendants were ordered) involve the possibility that two separate juries might well make awards which really represented double recovery by Grace for the same tortious conduct and the same injuries