**PREMIX, INC., Plaintiff,**

v.

**Francis E. ZAPPITELLI, et al., Defendants.**

**Civ. A. No. C80–1470Y.**

United States District Court, N.D. Ohio, E.D.

March 31, 1983.

Gerald A. Messerman, Cleveland, Ohio, Carl F. Muller, Ashtabula, Ohio, for plaintiff.

George F. Karch, Cleveland, Ohio, for defendants.

## MEMORANDUM OPINION AND ORDER

ANN ALDRICH, District Judge.

Plaintiff Premix, Inc. (Premix) brought this action against defendants Francis Zappitelli and BMC, Inc. (BMC) for injunctive relief, and compensatory and punitive damages, alleging that Zappitelli violated his employment agreement with Premix and that BMC tortiously interfered with that agreement.

The matter is before the Court following trial and presentation of evidence. In accordance with Rule 52 of the Federal Rules of Civil Procedure, the Court herewith submits its Findings of Fact and Conclusions of Law.

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332. The parties agree that it is the substantive law of Ohio that is applicable in this case.

### FINDINGS OF FACT

#### I

Plaintiff Premix is a manufacturer of fiberglass reinforced plastic molded parts and molding compounds. It is one of the leaders, if not the leader, in its industry and operates two manufacturing plants. Its main facility, located in North Kingsville, Ohio, employs approximately 500 people and contains a sophisticated laboratory devoted to research and development of new materials and products. A large percentage of Premix's business involves the manufacturing of bulk molding compounds. These compounds, which are manufactured in many variants, are sold throughout the United States for use in the production of plastic molded products. The segment of the plastics industry in which Premix is involved is highly specialized and represents only a small fraction of the total plastics industry. In 1980, the amount of plastic resins sold in the United States reached 35 billion pounds. Of that 35 billion pounds, only 100 million pounds are utilized in the production of fiberglass reinforced molding compounds. Of that 100 million pounds, only 12 million pounds are developed by compound manufacturers for sale to fin-

ished products manufacturers. Premix is one of approximately ten to fifteen companies in that 12 million pound group, a group of companies whose combined sales represent approximately ⅓,₀₀₀th of all annual plastic resin sales.

Defendant Francis Zappitelli is a former employee of Premix, and a current employee of defendant BMC.

Defendant BMC is a corporation whose principal place of business is in St. Charles, Illinois and whose operation is devoted exclusively to manufacturing bulk molding compounds. It employs approximately ten people and is a relative newcomer to the industry, having commenced doing business in 1978. Its president is James Cabak, who, together with John Rogers, are the sole shareholders of BMC.

## II

While the defendants contend that the development of any particular bulk molding compound is based upon a skill which is well known within the industry, the evidence does not support that assertion. Defendants' expert witness, Paul Fina, testified that one could analyze almost any product on the market and successfully determine its ingredients. He admitted, however, that although there are numerous publications and articles dealing with bulk molding compounds and fiberglass polyester resins, and that although he himself had published over 100 papers concerning the material, he has never been able to develop a commercially successful bulk molding compound. Fina stated that when he attempted to duplicate several compounds for another company, the compounds he chose were manufactured by Premix; however, he was unsuccessful in his attempts to duplicate the Premix compounds.

The evidence plainly established that the development of specific bulk molding compounds involves a highly sophisticated technology, requiring profound analysis of raw materials, of the chemical interactions which occur between those materials, and of physical properties yielded by various combinations of materials. The evidence demonstrated that in this industry, a particular company may, from time to time, have "an edge" in the technical expertise required to produce a certain type of compound. It was clear that Premix does possess unique methods of accomplishing results which often give it such a competitive "edge" over its rivals.

In a highly competitive industry characterized by rapidly developing technology, even if it is only a matter of months before a competitor is able to achieve the same results as the originator of a particular compound, that "lead time" is often crucial to the attainment and retention of customers. These characteristics of the industry also explain the reason why, as admitted by defendant's witnesses, confidentiality agreements and restrictive employment covenants are common.

## III

Francis Zappitelli was graduated from Bowling Green State University in 1977 with a major in chemistry, and completed one semester of graduate school at Purdue University. He began working for Premix in February of 1978. He testified that, prior to that time, he had "never seen a plastic part".

At the commencement of this employment, he signed a document entitled "Employment Agreement on Inventions and Confidential Data". The relevant sections of that agreement provide as follows:

7. I shall not, directly or indirectly, other than in the business of the Company or any of its subsidiaries or affiliates and in the scope of my said employment, disclose or use at any time (either during or subsequent to my said employment) any information, knowledge or data of the Company or of any of its subsidiaries or affiliates or any confidential information disclosed to the Company by any third parties under which said information was disclosed to the Company by virtue of a secrecy agreement, unless I shall secure the prior written consent of the Company.

9. I agree that the names, addresses, requirements and preferences of customers and suppliers of the Company are confidential and proprietary information of the Company and that I will not, either directly or indirectly, use or disclose to any person, firm or corporation such information about any of the present customers or suppliers of the Company or any other customers or suppliers of the Company with whom I have become acquainted during my employment with the Company, and that, during the period of two (2) years immediately after my termination of employment with the Company, for whatsoever reason, I will not directly or indirectly, either on my behalf or for any other person, firm or corporation, solicit, divert or otherwise attempt to take away any of the customers or suppliers of the Company.

Zappitelli spent his first three months of employment at Premix working in the research and development laboratory where the company's basic compound research is done. A large portion of his work there involved polymer analysis. Polymerization is the process by which small molecules combine to form larger molecules that contain the repeating structural units of the original molecules. Zappitelli dealt, in great detail, with fiberglass reinforced polyester resins in his research in the Premix laboratory. Such resins are also of major importance at BMC, where 99% of the compound manufactured is composed of fiberglass reinforced polyester resins.

Upon leaving the laboratory, Zappitelli moved to the Technical Services and Application Group (Tech Service Group), the Premix division that handles customer problems and "in-house" materials—those used in products where Premix molds the finished product in addition to manufacturing the bulk molding compound. Because the Tech Service Group had the primary responsibility for dealing with customer problems, Zappitelli worked with many Premix customers in this position. The Group would often work in conjunction with compound formulators, and Zappitelli gained a great deal of knowledge about solving the problems of particular customers.

Beginning in August of 1978, Zappitelli spent eighteen months as a compound formulator. His work involved the discovery of which ingredients, and what percentages of those ingredients, were essential to the formulation of certain types of compounds.

After serving as a formulator, Zappitelli became Supervisor of the Compound Department, where he supervised the entire compound manufacturing process. He had complete access to the technology and customer requirements regarding all compounds, and wrote numerous documents detailing Premix's work in developing certain compounds for certain customers. His exposure to the compound development process involved such areas as shelf life stability, flame resistance, shielding characteristics, dimensional stability, high and low temperature resistance, strength, and microwave transmissivity. He was also heavily involved in the submission of compound samples for evaluation by Underwriters' Laboratories. Zappitelli learned the identity of all Premix customers and the specific formulations purchased by certain customers. Such information would not have to be in written form for Zappitelli to remember it upon leaving Premix.

Two companies with whom Zappitelli had a particularly close connection while at Premix were Northland Aluminum and Dual-Lite. Zappitelli was deeply involved in the development of a compound for use in microwave cookware to be manufactured by Northland Aluminum. Dual-Lite manufactures electrical products, and it needed a compound for use in an electrical connector that would not smoke or burn when exposed to flame. While at Premix, Zappitelli altered the formulation of the Dual-Lite compound several times, and played a major role in developing the final formulation for that compound.

IV

Zappitelli first met with BMC representatives in Chicago in February of 1980, but no employment plans were finalized. BMC

representatives telephoned Zappitelli in Ohio on several occasions and wrote him a letter in Ohio offering him employment.

At a second meeting in Chicago in May of 1980, Zappitelli showed his employment agreement with Premix to BMC's representatives; BMC was subsequently advised in writing by Premix' counsel that BMC's hiring of Zappitelli would constitute a violation of that agreement. With complete knowledge of the agreement between Premix and Zappitelli, and without the advice of counsel as to the interpretation of that agreement, BMC advised Zappitelli that they "did not believe the agreement was legal". They hired Zappitelli, promising to save him "harmless" from any law suits based on the agreement, and induced him to work on the formulation and production of bulk molding compounds which BMC offered for sale to Premix customers.

The evidence clearly established that Zappitelli played a major role, while at Premix, in the development of compounds for Northland Aluminum and Dual-Lite. Premix devoted a great amount of time, in addition to a large sum of money, for the successful development of those compounds. BMC has no research and development facility, but shortly after starting work for BMC, Zappitelli developed a compound for Northland Aluminum that in 1981 resulted in Northland's purchase of 800,000 pounds of compound from BMC. Furthermore, Zappitelli, while at BMC, developed a compound for Dual-Lite. Dual-Lite has subsequently removed two of its molds from the Premix plant and placed them at Rogers Engineering. Rogers is under the same ownership as BMC and serves as the molding operation for compounds which are developed at BMC.

## CONCLUSIONS OF LAW

### I. Jurisdiction

Defendant Zappitelli does not dispute the jurisdiction of this Court as to him; defendant BMC does. This Court finds that it has jurisdiction over corporate defendant BMC, pursuant to § 2307.382(A) of the Ohio Revised Code, which states in pertinent part:

(A) A court may exercise personal jurisdiction over a person who acts directly or by an agent, as to a cause of action arising from a person's: * * *

(6) causing tortious injury in this state to any person by an act outside this state committed with the purpose of injuring persons, when he might reasonably have expected that some person would be injured thereby in this state.

The facts in this case satisfy the requirements for the exercise of personal jurisdiction over a foreign corporation. Defendant BMC is located in Illinois, but it utilized the mail and the telephone to contact Zappitelli while he was in Ohio. It arranged for Zappitelli to come to Chicago on two occasions to meet with BMC representatives. The result of those meetings was that Zappitelli left his established position of employment with Premix and his place of residence in Ohio, and relocated in Illinois. BMC's acts were purposeful, and it was certainly reasonably foreseeable that they would have consequences in the state of Ohio, consequences injurious to plaintiff Premix.

This Court finds that the exercise of its jurisdiction over defendant BMC meets the criteria established in *Southern Machine Co. v. Mohasco Industries, Inc.*, 401 F.2d 374 (6th Cir.1968). It is also fair and reasonable under the standard set forth in *International Shoe Co. v. State of Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). See also *Garrett v. Ruth Originals*, 456 F.Supp. 376 (S.D.Ohio 1978), (fact pattern strikingly similar to the case at bar).

### II. Breach of the Restrictive Employment Agreement by Defendant Zappitelli

#### A. Validity of the Agreement

The employment agreement between Premix and Zappitelli, signed voluntarily on two separate occasions by Zappitelli, is valid and binding under Ohio law. *Raimonde v. Van Vlerah*, 42 Ohio St.2d 21, 325 N.E.2d 544 (1975) sets forth the stan-

dard to be utilized in determining the validity of restrictive covenants in employment agreements:

Thus, many courts have abandoned the "blue pencil" test in favor of "reasonableness," which permits courts to determine, on the basis of all available evidence, what restrictions would be reasonable between the parties. Essentially, this test differs from the "blue pencil" test only in the manner of modification allowed. It permits courts to fashion a contract reasonable between the parties, in accord with their intention at the time of contracting, and enables them to evaluate all the factors comprising "reasonableness" in the context of employee covenants.

Although *Raimonde* has the effect of overruling Syllabi 2 and 3 of *Extine v. Williamson,* 176 Ohio St. 403, 200 N.E.2d 297 (1964), the *Raimonde* court continued to quote with approval the factors properly to be considered in determining the reasonableness of the contract, as set forth in *Extine:*

... the absence or presence of limitations as to time and space: * * * whether the employee represents the sole contact with the customer; whether the employee is possessed with confidential information or trade secrets; whether the covenant seeks to eliminate competition which would be unfair to the employer or merely seeks to eliminate ordinary competition; whether the covenant seeks to stifle the inherent skill and experience of the employee; whether the benefit to the employer is disproportional to the detriment to the employee; whether the covenant operates as a bar to the employee's sole means of support; whether the employee's talent which the employer seeks to suppress was actually developed during the period of employment; and whether the forbidden employment is merely incidental to the main employment. *Extine, supra,* at 406, 200 N.E.2d 297.

The restrictive employment agreement between Premix and Zappitelli does not set forth any geographic prescriptions. Zappitelli, upon leaving Premix, could have worked within one mile of Premix, or within a thousand miles, and it would have made no difference under the terms of the agreement.

Paragraph 9 of the agreement does state that for a period of two years after leaving his employment at Premix, Zappitelli could not divulge any Premix customer names, addresses, requirements or preferences. While paragraph 7 does not establish a time certain during which Zappitelli could not divulge any confidential information that he gained while working at Premix, this Court finds that, under the authority of *Raimonde,* paragraphs 7 and 9 of the employment agreement should be read together as preventing Zappitelli from making known any of the information listed in both of those paragraphs for a period of two years after leaving Premix.

This Court finds that the employment agreement prevented defendant Zappitelli from obtaining particular types of employment in a 100 million pound fraction of the 35 billion pound plastics industry. Of that 100 million pounds, only 12 million are sold in the segment of the industry involving the manufacture of compounds to be sold to customers. Thus, Zappitelli was restrained from obtaining employment in a fraction of the industry which accounts for only $1/3,000$ths of the total annual plastic resin sales. Furthermore, that restriction was in effect for a period of only two years after he left Premix. Zappitelli admitted that he could have found employment with a company not among the ten to fifteen firms involved in the same segment of the industry as Premix, and that in fact, he was offered a job by a non-competitor of Premix, a company still involved in the thermo plastic business.

This Court finds that the two year time restriction placed on Zappitelli upon leaving Premix was completely reasonable and did not unreasonably foreclose Zappitelli from obtaining employment elsewhere in the plastics industry.

This Court further finds that the employment agreement did not benefit Premix in a fashion to be disproportional to any detriment suffered by the employee. Consider-

ing the nature of the industry, and its highly competitive characteristics, the two year restriction on employment in a minor segment of the industry was reasonably necessary to protect the employer Premix. It was a restriction which did not unreasonably prohibit Zappitelli from exercising his skills, but which reasonably protected Premix from the exploitation by Zappitelli of the knowledge which he had gained during his employment at Premix.

There are legitimate reasons why a high technology company such as Premix would restrict a former employee from divulging trade secrets and confidential information. Such a company often makes a substantial investment in time and money in the development of a certain product for a particular customer. It may possess sole knowledge of the methods, learned through a lengthy trial and error process, of how to successfully produce that product. If a competitor were able to obtain the results of that research and development without making a similar investment in time and money, it would realize enormous cost savings and could easily and quickly undersell the originator of the product. While increased competition in the marketplace may initially seem appealing, there are reasons why such a situation is not always beneficial in this industry. First, a company which spends enormous sums of money on research and development should not be subject to immediate competition from another company which is reaping all of the benefits of the originator's work without the originator's expense.

Second, if the originating company believed that its ideas and methods could be readily utilized by another company, it would not be nearly as willing to undertake the research and development process required to create a new product, and its customer(s), and the public, would therefore suffer. It is imperative that engineers and scientists be encouraged to experiment and innovate to the limits of their potential in an atmosphere of confidentiality, without fear that their novel ideas could be quickly divulged to a competitor.

A third reason for disallowing a former employee from disclosing confidential information is that a customer dealing with a company such as Premix may not want it known publicly that it is in the process of developing a new product. The finished products manufacturer is also justifiably concerned with competition from other finished products manufacturers and would therefore request that not only its own employees, but those of Premix as well, remain silent about its product. Even after the public introduction of the product, the manufacturer may not want publicly known any information relating to the processes and experimentation that went into the development of the product, including the compound used to compose the product.

This Court thus finds that the two year limitation placed upon Francis Zappitelli upon his leaving Premix, during which he could not disclose any customer names, address, requirements or preferences, in addition to any trade secrets and confidential information, is reasonable. The restrictive covenants in the Agreement do not seek to eliminate ordinary competition, only that competition which would be highly unfair to Premix. Clearly, the benefit to the employer is not disproportional to the detriment to the employee, and does not seek to stifle the inherent skill of the employee. Zappitelli could have obtained employment in that part of the plastics industry representing 2,999/3,000 of the total annual plastic resin sales. The employment agreement between Premix and Zappitelli is therefore valid and binding, and in complete accord with the test established in *Raimonde.*

### B. Breach of the Agreement

■ This Court is of the opinion that it is unnecessary to split hairs with respect to the meaning of "trade secret".[1] It is suffi-

1. See *B.F. Goodrich v. Wohlgemuth,* 117 Ohio App. 493, 498–9, 192 N.E.2d 99, 104 (1963):

... a trade secret may consist of any formula, pattern, device, or compilation of information which is used in one's business, and

cient to find that Zappitelli, in violation of paragraphs 7 and 9 of the Agreement, did disclose and make use of confidential and proprietary information which he had obtained while employed by Premix.

Defendants' argument that none of the formulations or customer information which Zappitelli appropriated from Premix was "secret" simply does not wash. Nor does the argument that the formulations were not "novel", but mere combinations well known in the trade. See *W.R. Grace & Co. v. Hargadine,* 392 F.2d 9, 14 (6th Cir. 1968) (protecting as trade secrets experimentations with chemical formulas designed to perform specific jobs for specific customers).

Customer information and lists have traditionally been regarded as valuable property, even if a person who "troubled to follow the salesman could compile a reasonably correct list of his customers". *Briggs v. Butler,* 140 Ohio St. 499, 509, 45 N.E.2d 757, 762 (1942). A *fortiori* is this true when the particular problems of particular industrial customers are provided tailor-made solutions found for them by companies such as Premix. See *W.R. Grace, supra,* at 16.

■ It is an inescapable conclusion that defendant Zappitelli breached his employment agreement with Premix. His deep involvement with compound formulation for Northland Aluminum and Dual-Lite, first while working at Premix, and then after starting work at BMC, is well established. Zappitelli knew that Premix had sold compound to Northland Aluminum, and was himself involved in the development of that compound; yet he proceeded to undertake a similar project after starting work at defendant BMC. In 1981, Northland Aluminum purchased 800,000 pounds of bulk molding compound from BMC.

Zappitelli was also heavily involved, while at Premix, in compound development for Dual-Lite. He wrote at least one compound formula for the Dual-Lite product. After starting work at BMC, Zappitelli began formulating compound for Dual-Lite and consequently, Dual-Lite moved two of its five molds which were at Premix to Rogers Engineering. Such activities on the part of Zappitelli are clearly prohibited by paragraphs 7 and 9 of the restrictive employment agreement.

### III. *Tortious Interferences by BMC*

■ The evidence is clear that defendant BMC intentionally induced Zappitelli to breach the restrictive employment agreement. The fact that Zappitelli let it be known in the industry that he was interested in finding other employment cannot absolve BMC. BMC offered Zappitelli employment, and in fact, did employ him, with complete knowledge of the existence of the employment agreement with Premix. BMC representatives actually examined the Agreement before offering Zappitelli a job. BMC was informed by Premix counsel that Premix would consider Zappitelli to be in breach of the Agreement if he obtained employment at BMC. BMC, without obtaining legal advice, promised Zappitelli a substantial increase in salary, as well as a guarantee to hold him harmless from legal responsibility.

BMC intended for Zappitelli to formulate compound for Premix customers, among others, while working at BMC. BMC knew that Northland Aluminum and Dual-Lite were Premix customers but nevertheless encouraged Zappitelli to formulate compounds for those companies. BMC inten-

which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers.

\*  \*  \*  \*  \*  \*

... the fact that a number of engineers, scientists and technicians employed by a corpo-

ration for research and development in an area pertinent to the manufacture of an article, such as a space suit, are possessed of knowledge of the secret processes and devices discovered and created by their joint or individual efforts, does not make their knowledge general or public knowledge; and the processes and devices, if they are in fact trade secrets, remain the trade secrets of the employer.

tionally solicited Premix customers, utilizing misappropriated proprietary information and trade secrets of Premix, including customer lists, knowledge of customer preferences, and technology developed by Premix in the formulation of bulk molding compounds. Thus, conclusive evidence renders defendant BMC guilty of tortious interference with a contract.

## IV. *Remedies*

Premix seeks injunctive relief, as well as compensatory and punitive damages, and attorney's fees.

### A. *Injunctive Relief*

■ While this Court has the power to grant injunctive relief, see *B.F. Goodrich v. Wohlgemuth; Raimonde v. Van Vlerah; Briggs v. Butler,* such relief seems peculiarly inappropriate at this juncture. It would have been appropriate had this action commenced with a petition for a temporary restraining order when defendant Zappitelli first contemplated a change of employment, as in *Goodrich.* However, this action came from state court after lengthy removal and jurisdictional proceedings; by the time the motion for a preliminary injunction was heard, defendant Zappitelli had already been employed at BMC for the better part of a year, and undoubtedly had divulged much of the proprietary information he possessed. Injunctive relief, even then, would have had all the earmarks of the proverbial "locking the barn door after the horse has been stolen". By now, it also appears unduly harsh, and unnecessarily complicated and disruptive, with respect to both defendants. This Court declines to grant it.

### B. *Compensatory Damages*

■ Premix is entitled to recover the profits lost due to Zappitelli's breach of his employment agreement, and caused by BMC's tortious interference with that contract. See *Fremont Oil v. Marathon Oil,* 26 Ohio Op.2d 109, 192 N.E.2d 123 (1963); *Riverside Coal v. United Mineworkers of America,* 410 F.2d 267 (6th Cir.1969).

Premix has presented evidence that it lost $179,507 due to BMC's gaining a portion of the Northland Aluminum account, and that it will lose $90,000 a year due to lost profits on the Dual-Lite account. Defendants have produced no evidence which adequately refutes these assertions. Thus, this Court will award Premix the $179,507 it claims it lost on the Northland Aluminum account and will award it $180,000 for lost profits on the Dual-Lite account. This latter figure is arrived at by awarding Premix $90,000 a year for each of the two years that Francis Zappitelli was to be disallowed from divulging any trade secrets or confidential information. This total of $359,507 in compensatory damages is awarded against both defendants, jointly and severally.

### C. *Punitive Damages*

■ No authority has been cited, nor does research produce any, where an Ohio court has awarded punitive damages for a breach of contract without a showing of "actual malice" as defined in *Pickle v. Swinehart,* 170 Ohio St. 441, 166 N.E.2d 227 (1960). The evidence supports no such factual finding with respect to defendant Zappitelli, and the court declines to assess punitive damages against him.

■ Punitive damages are allowed in cases involving intentional torts where legal malice can be inferred. See *W.R. Grace & Co. v. Hargadine,* 392 F.2d 9 (6th Cir.1968); *Detling v. Chockley,* 70 Ohio St.2d 134, 436 N.E.2d 208 (1982). The evidence here is substantial that BMC, in tortiously interfering with the employment contract between Premix and Zappitelli, exhibited such "reckless, wanton and wilful disregard of probable damages" as to support a finding of inferred malice, and a basis for punitive damages. Moreover, in light of the inappropriateness of injunctive relief, and the importance of finding a remedy that will serve as a deterrence to such intentional tortious behavior, an award of punitive damages against BMC is appropriate. The Court awards punitive damages against BMC in the amount of $150,000.

Premix's request for attorney's fees is denied.

In conclusion, the Court finds in plaintiff's favor and awards it the sum of $359,-507 in compensatory damages against both defendants, jointly and severally, and the sum of $150,000 in punitive damages against defendant BMC.

IT IS SO ORDERED.