The FITNESS EXPERIENCE,
INC. Plaintiff

v.

TFC FITNESS EQUIPMENT,
INC., et al. Defendants

No. 1:03 CV 2314.

878

United States District Court,
N.D. Ohio,
Eastern Division.

Dec. 17, 2004.

Keith L. Pryatel, Kastner, Westman & Wilkins, Thomas Evan Green, Kastner Westman & Wilkins, Akron, OH, for Plaintiff.

Mark R. Koberna, Sonkin & Koberna, Stephen B. Doucette, Sonkin & Koberna, Cleveland, OH, for Defendants.

### MEMORANDUM OF OPINION AND ORDER

WELLS, District Judge.

In early 2003, several former employees of plaintiff The Fitness Experience, Inc. ("Fitness Experience"), a residential and commercial supplier and servicer of exercise equipment, formed a competing company, defendant TFC Fitness Equipment, Inc. ("TFC Fitness"). After TFC started doing business, it hired several other former Fitness Experience employees. As a result of the formation of TFC and its subsequent activities, Fitness Experience filed this lawsuit against TFC and its former employees, defendants Anthony Stropoli ("Stropoli"), Fred Ramirez ("Ramirez"), Chris Adams ("Adams"), Christopher Longnecker ("C.Longnecker"), Richard Longnecker ("R.Longnecker"), Jane Beatty ("Beatty"), and Karen Doyle ("Doyle") (collectively referred to as the "Individual Defendants"). In its amended complaint, Fitness Experience sues the Individual Defendants for breach of contract (count one), promissory estoppel (count two), misappropriation of trade secrets (count five), and unfair competition (count six), and sues Defendants Stropoli, Ramirez, and Adams for breach of their duty of loyalty (count three) and tortious interference with plaintiff's contractual relationships (count four). Al-

though the amended complaint is not entirely clear, plaintiff appears to allege counts four, five, and six against defendant TFC fitness as well.

Before this Court are two separate motions for summary judgment. On 1 September 2004, plaintiff Fitness Experience filed a motion for summary judgment on counts one, three, and four. (Docket # 72). Defendants filed a collective response brief in opposition on 4 October 2004. (Docket # 79). Plaintiff followed with a reply. (Docket # 82). On 24 September 2004, defendants filed their own motion for summary judgment on counts one and four. (Docket # 78). Fitness Experience filed an opposition brief on 6 October 2004. (Docket # 80). Defendants then filed a reply brief. (Docket # 81). At the heart of the dispute on summary judgment is the enforceability of non-compete agreements signed by the Individual Defendants when they were employed by Exercare, a company acquired by plaintiff Fitness Experience.

For the reasons set forth below, plaintiff's motion for summary judgment will be denied and defendants' summary judgment motion will be granted. As a consequence of this ruling, plaintiff's first, third, and fourth claims for relief will be dismissed.

## I. BACKGROUND

This case involves a dispute over alleged wrongdoing by plaintiff's former employees in establishing and working for a competitor. To provide the necessary context, the Court reviews the nature of Fitness Experience and TFC Fitness's business, the relationship between Exercare, Fitness Experience, and the Individual Defendants, and the Individual Defendants' role in forming and working for TFC Fitness.

## A. Fitness Experience and TFC Fitness

### 1. Fitness Experience

The Fitness Experience is a company which sells and services residential and commercial exercise equipment. Like Fitness Experience, the Exercare Corporation ("Exercare") operated specialty fitness stores which sold ellipticals, treadmills, and home gyms. (Adams Dep. at 20–21; Defendants' Joint Responses to Plaintiff's First Request for Admissions at 5).[1] On 1 October 2002, Fitness Experience acquired all of the assets and certain scheduled and listed liabilities of Exercare, pursuant to an asset acquisition agreement ("Asset Agreement").[2] (Massie Aff. at ¶¶ 1–2). Among the assets purportedly acquired by Fitness Experience were several contracts to which Exercare was a party, including Non–Competition Agreements entered into between Exercare and its employees. (Massie Aff. at ¶ 2, Ex. A).[3] With the acquisition of

---

1. Included in the appendix to Docket # 72, Defendants' Joint Responses to Plaintiff's First Request for Admissions will hereinafter be referred to as ("Defs. Admissions.")

2. The Asset Agreement is attached as Exhibit A to Brian Massie's affidavit.

3. Specifically, the Asset Agreement provides that the following are included among "Acquired Assets":

 [A]ll contracts, leases, licenses, indentures, agreements, commitments, and all other le-

gally binding arrangements, whether oral or written ("Contracts "), to which Exercare is a party or by which Exercare is bound that are listed in Schedule 3.06 or 3.08, and all other Contracts (including purchase orders and sales orders) to which Exercare is a party or by which Exercise is bound (collectively, the "Assigned Contracts ")....

(Section 1.02(a)(viii) of the Asset Agreement). Covenants not to compete, signed by each of Exercare's employees, were included as Contracts listed in Schedule 3.08.

Exercare by Fitness Experience, Fitness Experience began operating the Exercare retail stores under its corporate name and Exercare altogether ceased operating as an ongoing business concern. (Massie Aff. at ¶¶ 2 and 7–12; Massie Dep. at 65–66 and 80).

Prior to its acquisition of Exercare, Fitness Experience maintained just one retail store in Ohio, located in Sylvannia, Ohio. (Massie Aff. at ¶ 3). After the acquisition, Fitness Experience took over running Exercare's retail stores located in several Ohio cities including Beachwood, Mayfield Heights, North Olmsted, and Westlake.[4] (Massie Aff. at ¶ 13, Ex. B). In October and November 2002, Fitness Experience also opened several new retails stores in Dayton, Fairlawn, and Mason. (Massie Aff. at ¶ 12).

### 2. *TFC Fitness*

TFC Fitness currently operates three specialty fitness retail locations in Beachwood, Canton, and North Olmsted, Ohio which sell treadmills, ellipticals, home gyms, stationary bikes, and free weights. (Massie Aff. at ¶ 7; Defs. Admissions at 4; Adams Dep. at 46; Stropoli Dep. at 37). All three TFC Fitness stores compete with and are located within 150 miles of Fitness Experience Stores. (Defs. Admissions at 3 and Adams Dep. at 124). TFC Fitness' Beachwood store is located within 500 feet of a Fitness Experience store, its North Olmsted store is about "1,000 feet" away from a Fitness Experience store, and its Canton store is approximately a "quarter mile, half a mile" from a Fitness Experience store. (Adams Dep. at 47, 51–53, and 55; Ramirez Dep. at 94). While TFC retails the same type of products as Fitness Experience, it purportedly sells different product lines and targets a "wider range of demographics." (Adams Dep. at 63 and 119; Stropoli Dep. at 37–38).

### B. Individual Defendants' Employment Relationship with Exercare and Fitness Experience

Immediately prior to their respective employment with Fitness Experience, each of the Individual Defendants worked for Exercare. (Defs. Admissions at 4). After relating the Non–Competition Agreements at issue in this case, the Court briefly outlines each Individual Defendants' work experience with Exercare and Fitness Experience.

### 1. *Non–Competition Agreement*

While employed by Exercare, the Individual Defendants signed identical Non–Competition Agreements which provided:

> I further agree that during the period of my employment and for a period of time after termination of my employment, equal to the duration of my employment, but in no event less than 6 months nor in excess of 18 months after the termination of my employment, I will not directly or indirectly enter into competition with Exercare as an owner, partner, stockholder, employee, consultant or independent contractor in the sale or distribution of fitness equipment or accessories within a 150 mile radius of the nearest Exercare retail or commercial office, or in the sale or distribution of bicycles or accessories within a 20 mile radius of the nearest Exercare bicycle retail store.

(Attachments A–G to Defs. Admissions).[5] According to defendants, Mr. Adams and

---

4. Fitness Experience closed the Westlake retail store in April 2004. (Massie Aff. at ¶ 7).

5. Ms. Beatty's non-compete agreement differed slightly from those signed by the other defendants in that her geographical restriction was 50 miles instead of 150. (Defs. Admissions, at 2, Attachment G)..

Mr. Stropoli, in January 2003, asked Brian Massie, former president of Exercare,[6] where the non-compete agreements with Exercare stood after the asset purchase by Fitness Experience, and Mr. Massie allegedly responded that they were no longer valid but that he would check with his attorneys to confirm that. (Adams Dep. at 68–69; Stropoli Dep. at 48–50). In mid-February 2003, Mr. Massie allegedly called Stropoli and told him that his attorneys confirmed that the non-compete agreements were no longer valid and would not "hold water." (Stropoli Dep. at 51–52). Stropoli passed on this information about the non-compete agreements to Adams and Ramirez. (Stropoli Dep. at 54). Mr. Massie denies ever telling Adams or Stropoli that the non-compete agreements no longer had any legal effect. (Massie Aff. at ¶ 6).

### 2. *Fred Ramirez*

Defendant Fred Ramirez began his employment with Exercare in 1984. (Ramirez Dep. at 4–5).[7] In late 1986 or 1987, Ramirez became Store Manager for Exercare's Beachwood Store. (Ramirez Dep. at 9–10). Ramirez, on 14 November 1996, signed the non-compete agreement described above which "supercede[d] all prior agreements and understandings." (Defs. Admissions at 1, Attachment A).[8] In 1996, Ramirez took on responsibility for managing both the Beachwood and Mentor stores. (Ramirez Dep. at 11–12). In 1998,

Ramirez became area manager of Exercare's retail stores in Northern Ohio. (Ramirez Dep. at 13–14). In 1999 or 2000, Ramirez was promoted to the position of sales training manager for all of Exercare's stores in Ohio and Pennsylvania. (Ramirez Dep. at 14–16). After Exercare eliminated the sales training manager position in 2001, Ramirez oversaw the start of a new venture called "Value Fitness" and eventually became Exercare's Beachwood store manager again. (Ramirez Dep. at 16–22). After Fitness Experience's October 2002 asset acquisition of Exercare, Ramirez continued working in this same capacity until approximately one and a half weeks after his 6 March 2003 notice of resignation. (Ramirez Dep. at 24–25 and 40; Defs. Admissions at 1, Attachment A).

### 3. *Anthony Stropoli*

In September 1994, defendant Anthony Stropoli began working for Exercare as a sales associate at its Canton store. (Stropoli Dep. at 4–5). Approximately two years later, he became store manager of Exercare's Akron store. (Stropoli at 5–6). Stropoli signed a non-compete agreement with Exercare on 29 January 1999. (Defs. Admissions at 2, Attachment B; Stropoli Dep. at 25, Ex. A).[9] Prior to the asset purchase by Fitness Experience, Stropoli served as regional sales manager for Exercare overseeing its Cleveland, Akron, Canton, and Youngstown-area stores. (Stro-

---

**6.** Prior to the asset purchase, Brian Massie was the president and sole shareholder of Exercare. (Massie Aff. at ¶ 1). After the purchase, he became vice-president of finance and eventually vice-president of operations for Fitness Experience. (Massie Aff. at ¶ 1).

**7.** At the time Mr. Ramirez was hired the company was called Brookpark Healthcare. (Ramirez Dep. at 5). In 1985 or 1986, Brookpark Healthcare became Exercare. (Ramirez Dep. at 5).

**8.** Ramirez's 1991 employment agreement contained a slightly different non-compete agreement, which was superceded by the one he signed in 1996. (Defs. Admissions at 1, Attachment A).

**9.** Stropoli's 1994 and 1995 employment agreements contained slightly different non-compete agreements and he had also previously signed additional non-compete agreements in 1996 and 1997, all of which were superceded by the one he signed in 1999. (Defs. Admissions at 2, Attachment B).

poli Dep. at 6–8). During the first two months after the asset purchase, Stropoli continued to oversee those areas, but many of his responsibilities were eliminated. (Stropoli Dep. at 8–10). He was no longer responsible for floor layouts or selection, firing employees, or establishing procedures, pricing, promotions. (Stropoli Dep. at 10). Eventually, the title of his position was changed to Cleveland district leader. (Stropoli Dep. at 10). Effective 1 March 2003, Stropoli resigned from Fitness Experience. (Stropoli Dep. at 57, Ex. C).

### 4. *Christopher Adams*

Defendant Christopher Adams began his employment with Exercare in February 1989 at its Beachwood store. (Adams Dep. at 6). He signed the non-compete agreement at issue in this case on 29 October 1997.[10] (Defs. Admissions at 2, Attachment C; Adams Dep. 38 and 40–41). Immediately prior to the asset purchase by Fitness Experience, Adams worked as Exercare's Purchasing Manager. (Adams Dep. at 6–7). While his salary remained unchanged after the change in ownership, his job responsibilities changed to some extent as he was no longer responsible for ordering from vendors. (Adams Dep. at 10–11 and 34). In January 2003, his position changed from purchasing manager to transfer manager as he became responsible for checking and transferring inventory between Ohio stores. (Adams Dep. at 27–28). Adams resigned from his employment with Fitness Experience on 1 March 2003. (Defs. Admissions at 2, Attachment C; Adams Dep. at 68 and 82–83, Ex. B).

### 5. *Richard Longnecker*

In December 1998, defendant Richard Longnecker was hired by Exercare as a sales associate at its Canton store. (R. Longnecker Dep. at 5). He signed a non-compete agreement with Exercare on 9 December 1998. (Defs. Admissions at 2, Attachment D; R. Longnecker Dep. at 26–27). In late September or early October 2002, R. Longnecker became store manager of the newly opened Fairlawn store. (R. Longnecker Dep. at 5–6). In mid-September 2003, R. Longnecker was terminated from his position as store manager because of his sales performance. (R. Longnecker Dep. at 15–16, 18 and 20). At the time he was fired, R. Longnecker claims that Mr. Nagy told him that the non-compete agreement he had signed was no longer valid. (R. Longnecker Dep. at 28).

### 6. *Christopher Longnecker*

Defendant Christopher Longnecker began his employment with Exercare in July 1998 as a sales associate at its Canton store. (C. Longnecker Dep. at 5). He signed a non-compete agreement with Exercare on 8 July 2000. (Defs. Admissions at 2, Attachment E; C. Longnecker Dep. at 25–26).[11] Just prior to Fitness Experience's asset purchase, he was working as an Exercare store manager at its Mayfield location. (C. Longnecker Dep. at 5). After the asset purchase, C. Longnecker continued working as store manager at the same location. (C. Longnecker Dep. at 6 and 32). In late September 2003, C. Longnecker was terminated from his position as store manager for his refusal to sign Fit-

---

10. Adams' 1994 employment agreement contained a slightly different non-compete agreement and he had also previously signed an additional non-compete agreement earlier in 1997, both of which were superceded by the one he signed in October 1997. (Defs. Admissions at 2, Attachment C).

11. C. Longnecker had previously signed two identical non-compete agreements in 1998 and 1999, both of which were superceded by the one he signed in 2000. (Defs. Admissions at 2, Attachment E).

ness Experience's non-compete agreement. (C. Longnecker Dep. at 13–14 and 27–30).

### 7. *Karen Doyle*

Defendant Karen Doyle began her employment with Exercare in August 1993 as a sales associate in its Canton store. (Doyle Dep. at 4–5). She signed a non-compete agreement with Exercare on 1 October 1996. (Doyle Dep. at 28–30, Ex. 2; Defs. Admissions at 2, Attachment F).[12] Prior to Fitness Experience's asset acquisition of Exercare, Doyle was working as store manager of its Canton store. (Doyle Dep. at 6). After the acquisition, Doyle continued working in that capacity until June 2003. (Doyle Dep. at 6 and 11). In June 2003, Doyle was removed from her position at the Canton store, but was offered positions as store manager of the Strongsville store and as a sales associate at the Fairlawn store. (Doyle Dep. at 11–12). Doyle elected not to accept the Strongsville or Fairlawn positions because both would involve a substantial decrease in pay, both involved a longer commute, and the Fairlawn position would be a demotion. (Doyle Dep. at 18–21 and 26–27; Defs. Admissions at 2, Attachment F).

### 8. *Jane Beatty*

Jane Beatty began her employment with Exercare as a sales associate in August 1990 at its Beachwood location. (Beatty Dep. at 4–5). She signed a non-compete agreement with Exercare on 28 October 1997. (Defs. Admissions at 2, Attachment G; Beatty Dep. at 23, Ex. 2).[13] Immediately prior to the asset purchase by Fit-

ness Experience, Ms. Beatty was working for Exercare as store manager of its Westlake store. (Beatty Dep. at 5). After the asset purchase, Ms. Beatty continued to work as store manager. (Beatty Dep. at 7). However, in July or August 2003, Ms. Beatty moved from being store manager in Westlake to store manager in Strongsville and her pay decreased. (Beatty Dep. at 10 and 13–14). After working in Strongsville for approximately two months, Ms. Beatty was terminated for her refusal to sign Fitness Experience's non-compete agreement. (Beatty Dep. at 21). Her last day of employment was 31 August 2003. (Beatty Dep. at 34).

### C. Individual Defendants and TFC Fitness

#### 1. *Formation of TFC Fitness*

Shortly after Fitness Experience's asset purchase of Exercare, Adams, Ramirez, and Stropoli began discussing the possibility of starting their own specialty fitness equipment business. (Adams Dep. at 98–99; Stropoli Dep. at 63; Ramirez Dep. at 55 and 77).[14] Prior to their respective resignations, Adams, Ramirez, and Stropoli discussed this possibility numerous times, with all of their discussions occurring outside of work. (Adams Dep. at 100–101; Stropoli Dep. at 64; Ramirez Dep. at 78). Although they discussed these possibilities while they were still employees with Fitness Experience, they did not contact any of the customers or vendors of Exercare or Fitness Experience about their possible venture and did not,

---

**12.** Doyle's 1993 employment agreement contained a slightly different non-compete agreement and she had also previously signed an additional non-compete agreement earlier in 1996, both of which were superceded by the one she signed in October 1996. (Defs. Admissions at 2, Attachment F).

**13.** Beatty's 1994 employment agreement contained a slightly different non-compete agreement, which was superceded by the one she signed in October 1996. (Defs. Admissions at 2, Attachment G).

**14.** Some of these initial conversations also included Ray Nagy. (Stropoli Dep. at 57–58 and 63).

absent two exceptions, even discuss with them the possibility of establishing an independent business.[15] (Adams Dep. at 108–109 and 133–34; Ramirez Dep. at 80; Stropoli Dep. at 68–69). Prior to the termination of his employment with Fitness Experience, Adams did not meet or have any discussions with any commercial real estate brokers, potential landlords, insurance agents, or contractors. (Adams Dep. at 103 and 106–107). However, Ramirez, before his resignation, had one meeting with the Small Business Administration, met with an insurance agent, met with real estate agents, and visited and reviewed drafts of a lease for a possible retail location on Chagrin Boulevard. (Ramirez Dep. at 44–45, 78, 80–82, 91, 94, and 101, Exs. E, F, and G). Similarly, Stropoli, prior to resigning his position with Fitness Experience, met with real estate agents from Weston Real Estate, visited, along with Ramirez, the Chagrin Boulevard location, and reviewed drafts of lease agreements. (Stropoli Dep. at 65–66, 76–77, and 81–82, Exs. D, E, and F).[16]

While nothing had been formally established prior to their respective resignations in early March, Adams, Stropoli, and Ramirez left Fitness Experience with the intention of further exploring the possibility of starting their own retail fitness business venture. (Adams Dep. at 102; Ramirez Dep. at 42). After Adams, Ramirez, and Stropoli resigned from Fitness Experience, TFC Fitness was incorporated in March 2003, with Ramirez, Adams, and Stropoli serving as TFC Fitness' owners and sole shareholders. (Adams Dep. 45–46, Ex. C; Ramirez Dep. at 73; Stropoli Dep. at 30; Defs. Admissions at 3). In addition to owning TFC Fitness, Adams

serves as its treasurer, Ramirez works as its operations director, and Stropoli is TFC Fitness' president. (Adams Dep. at 45; Ramirez Dep. at 73; Stropoli Dep. at 30). TFC Fitness opened its three existing retail stores in May 2003 (Beachwood), November 2003 (North Olmsted), and July 2004 (Canton). (Adams Dep. at 46–47, 50–51, and 53).

2. *TFC Fitness' Hiring of Defendants C. Longnecker, R. Longnecker, Beatty and Doyle*

Although Adams, Ramirez, and Stropoli never discussed their plans to start their own business with C. Longnecker, R. Longnecker, Beatty, and Doyle and never contacted them about job opportunities with TFC Fitness, each of these individuals eventually approached TFC Fitness about possible jobs. (Stropoli Dep. at 72–73; Beatty Dep. at 34–36; C. Longnecker Dep. at 35; R. Longnecker Dep. at 32–33; Doyle Dep. at 23 and 35). When C. Longnecker, R. Longnecker, Beatty, and Doyle interviewed with TFC Fitness, they were no longer employed by Fitness Experience. (Stropoli Dep. at 38–39). While Mr. Stropoli conducted most of the interviews, all three owners together decided to hire C. Longnecker, R. Longnecker, Doyle, and Beatty. (Adams Dep. at 59–61; Ramirez Dep. 73–74; Stropoli at 31–33). When hiring them, Ramirez, Stropoli, and Adams knew that all four had signed covenants not to compete with Exercare. (Adams Dep. at 59–61; Ramirez Dep. at 73–74; Stropoli Dep. at 31–33).

Hired by TFC Fitness in early October 2003, Ms. Beatty currently works for it as a sales associate at its North Olmsted

---

**15.** The two exceptions involved two general conversations that Ramirez had, sometime in early 2003, with two customers, who he described as personal friends, about the possibility of starting his own specialty retail fitness business. (Ramirez Dep. at 83).

**16.** Stropoli also looked at some potential property in Canton and reviewed some possible leases, though he did not engage any real estate agents. (Stropoli Dep. at 79–81).

store. (Beatty Dep. at 29 and 36). C. Longnecker was hired by TFC Fitness in early October 2003 and is employed as a sales associate at its Beachwood store. (C. Longnecker Dep. at 33). In late September 2003, R. Longnecker began working for TFC Fitness and has worked as a sales associate at its Beachwood, North Olmsted, and Canton stores. (R. Longnecker Dep. at 30 and 38). Hired by TFC Fitness in early October 2003, Doyle currently works as a sales associate at its Canton store. (Doyle Dep. at 31–32 and 35).

## II. STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate if the evidence in the record shows there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The moving party always bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). However, where the nonmoving party has the burden of proof in a case, the moving party can satisfy its initial burden "by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case." *Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1087 (6th Cir. 1996).

If the motion is properly made and supported as provided in Rule 56(c), the nonmoving party must then "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. It is not enough for the nonmoving party to point to any alleged factual dispute between the parties. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) To survive summary judgment, the dispute must involve a genuine issue of material fact; that is, a fact that might affect the outcome of the suit under the governing substantive law. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505 (noting that the "mere existence of a scintilla of evidence in support of the [nonmovant]'s position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant].")

Summary judgment is intended as a mechanism for isolating and disposing of "factually unsupported claims or defenses." *Celotex*, 477 U.S. at 323–24, 106 S.Ct. 2548. To that end, the inquiry on summary judgment mirrors the directed verdict standard, and summary judgment should be entered when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (quoting *Matsushita Elec. Industrial Co.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). If the nonmoving party bears the burden of proof at trial and fails to present "a jury question as to each element of its case," the motion for summary judgment must be granted. *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir.1996) (citing *Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548). Given the focus of summary judgment on evaluating what a reasonable jury could find, courts may not consider hearsay evidence in reaching their conclusions. *Hartsel v. Keys*, 87 F.3d at 799. In considering a motion for summary judgment, the evidence must be viewed in the light most favorable to the party opposing the motion. *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348.

## III. ANALYSIS

While the parties' joint summary judgment motions involve three of Fitness Experience's claims, the core dispute implicated by the motions relates to the

enforceability of the non-compete agreements signed by the Individual Defendants during their employment with Exercare. Accordingly, the Court begins its analysis with the non-compete agreements before turning to the viability of Fitness Experience's claims.

### 1. Non–Compete Agreements

The parties' strenuously dispute the legal effect, or lack thereof, of the non-compete agreements signed by the Individual Defendants. Specifically, the Court is faced with answering the following key questions: 1) Were the Exercare non-compete agreements validly assigned to Fitness Experience?; 2) If they were not assignable or properly assigned, did a novation occur?

### a. Assignability of the Non–Compete Agreements

■ As noted above, Fitness Experience acquired Exercare's assets pursuant to an asset purchase agreement, effective 1 October 2002. Among the assets purportedly transferred to Fitness Experience were the non-compete agreements entered into by Exercare and the Individual Defendants. While these facts are indisputable, the parties disagree over whether the non-compete agreements were validly assigned. The assignability of a particular contract is a question of law properly resolved by the court. *Managed Health Care Assoc. v. Kethan*, 209 F.3d 923, 926 (6th Cir.2000).

■ The Ohio Supreme Court has not definitively resolved the assignability of non-compete agreements when one corporation has acquired the assets of another. However, in *Rogers v. Runfola*, the Ohio Supreme Court addressed the issue of assignability of non-compete agreements in the context of an asset transfer from a sole proprietorship to newly-incorporated business, pursuant to an assignment agreement. 57 Ohio St.3d 5, 7, 565 N.E.2d 540 (1991). In *Rogers*, the employees, while working for the sole proprietorship, signed non-compete agreements which precluded them "from engaging in court reporting or public stenography as an employee or otherwise in Franklin County, for a period of two years." *Id.* at 5–6, 565 N.E.2d 540. After rejecting the employees argument that non-compete agreements can never be assigned, the Ohio Supreme Court found the assignment was valid in that particular case because the change in structure had no effect on the ownership of the business and no effect on the employees duties or daily operations. *Id.* at 7, 565 N.E.2d 540. While *Rogers* does not control the outcome of this case because here there was clearly a change in ownership, it does make clear that non-compete agreements are not *per se* unassignable. *See also Blakeman's Valley Office Equip., Inc. v. Bierdeman*, 152 Ohio App.3d 86, 90, 786 N.E.2d 914 (2003).[17] Subsequent Ohio Court of Appeals' decisions dealing with the assignability of non-compete agreements in connection with the sale of a business have further explained that non-compete agreements may still be assignable notwithstanding silence in the agreement as to assignability and even absent the employ-

---

**17.** While the Sixth Circuit, in *W.R. Grace & Co. v. Hargadine*, 17 Ohio Misc. 199, 392 F.2d 9 (6th Cir.1968), "arguably held that noncompetition clauses are not assignable under Ohio law," it has more recently commented unfavorably on that decision and referred to its holding "with respect to assignability [as] ambiguous at best." *Managed Health Care Assoc. v. Kethan*, 209 F.3d 923, 930 (6th Cir. 2000). Moreover, since *W.R. Grace* was de-

cided in 1968, the Ohio Supreme Court's decision in *Rogers* and several Ohio appellate decisions undermine its apparent conclusion regarding assignability. Thus, while this Court is generally bound by relevant Sixth Circuit precedent construing Ohio law, it need not follow *W.R. Grace's* ambiguous and out-dated interpretation of Ohio law. *Cf. Stubl v. T.A. Systems*, 984 F.Supp. 1075, 1093 (E.D.Mich.1997).

ee's consent. *Artromick Int'l v. Koch,* 143 Ohio App.3d 805, 807–809, 759 N.E.2d 385 (2001); *Bierdeman,* 152 Ohio App.3d at 91, 786 N.E.2d 914.[18] Thus, the assignment of the Individual Defendants' non-compete agreements is not categorically precluded even though the agreements did not explicitly state that they were assignable and even though the Individual Defendants did not expressly consent to the assignment.

However, simply because non-compete agreements may be assignable absent express language dealing with assignability and without employee consent does not mean that every such agreement is automatically assignable. *Mid–West Presort Mailing Services, Inc. v. Clark,* 1988 WL 17825, *1 (Ohio App. Feb. 10, 1988) (explaining that "covenants not to compete may, in proper circumstances, be assignable"). The Court must still engage in an analysis of whether the particular non-compete agreements at issue in this case were assignable.[19] While it is true that, under Ohio law, rights under a contract are generally assignable, *May–Som Gulf, Inc. v. Chevron U.S.A., Inc.,* 869 F.2d 917, 924 (6th Cir.1989), Ohio law does not treat non-compete agreements like any other contract. While non-compete agreements between an employer and employee in an at-will relationship are not strictly prohibited, Ohio courts continue to view non-competition agreements with "some skepticism," as contracts to be "cautiously considered and carefully scrutinized." *Land Lake Employment Group of Akron v. Columber,* 101 Ohio St.3d 242, 244, 804 N.E.2d 27 (2004).[20] Non-competition clauses are to be strictly construed in fa-

---

**18.** In deciding questions of state law, federal courts must rule as would the state's highest court. *Matulin v. Village of Lodi,* 862 F.2d 609, 616 (6th Cir.1988); *Ziegler v. IBP Hog Market, Inc.,* 249 F.3d 509, 517 (6th Cir. 2001). Since the Ohio Supreme Court has not spoken definitively on the precise issue before this Court, it is appropriate for this Court to look to Ohio court of appeals' decisions as the "next best indicia of the state's position." *Matulin,* 862 F.2d at 616. Intermediate appellate court decisions control "unless other persuasive factors convince the federal court that the state's highest court would disagree with the appellate court determinations." *Id.* This rule applies regardless of whether the appellate court decision is published or unpublished. *Ziegler,* 249 F.3d at 517.

**19.** In addition to its arguments regarding Ohio appellate case law on this question of assignability, Fitness Experience urges this Court to look at other jurisdictions to determine the rule likely to be adopted by the Ohio Supreme Court. (Docket # 72, at 10). To this end, its cites a Sixth Circuit case which explained that "a majority of courts permit the successor to enforce the employee's restrictive covenant as an assignee of the original covenantee (the original employer)." *Kethan,* 209 F.3d at 929. While the Sixth Circuit has noted that the majority rule can be used as "persuasive authority," *Kethan,* 209 F.3d at 929, the Court finds this particular majority rule unhelpful. Ohio courts have, consistent with the majority rule, permitted the assignability of non-compete agreements; however, they have also imposed some restrictions on such assignments which are not contemplated by majority rule or Kentucky law as stated by the Sixth Circuit. Accordingly, this Court relies on the Ohio Supreme Court case most on point, *Rogers,* and other Ohio appellate decisions to ferret out the nuances of Ohio law.

**20.** Drawing on dicta taken out of context, plaintiff's overstate *Columber* as a "landmark decision" intended to depart from prior Ohio Supreme Court precedent which viewed non-compete agreements skeptically and mischaracterize it as establishing a "newfound receptiveness to non-compete employment contracts." (Docket # 72 at 6–7). In *Columber,* the Ohio Supreme Court, responding to a distinct certified question, held that:

consideration exists to support a noncompetition agreement when, in exchange for the assent of an at-will employee to a proffered noncompetition agreement, the employer continues an at-will employment relationship that could legally be terminated without cause.

vor of freedom of competition and against the party seeking enforcement. *Mid–West Presort*, 1988 WL 17825 at *2; *Jay's Service, Inc. v. Hurd*, 1994 WL 692921, *3 (Ohio App.Ct. Oct. 12, 1994). Accordingly, when a non-compete agreement does not expressly state whether or not it is assignable, Ohio courts do not presume assignability, as suggested by plaintiff, but rather carefully consider the intent of the parties and find a non-compete agreement to be assignable only under certain prescribed circumstances.[21]

 When a non-compete agreement is silent about assignability, courts must give controlling effect to the intent of the parties which is primarily ascertained by determining "whether the covenant employs words which indicate that assignment was contemplated and whether assignability is necessary to protect the goodwill of the business being sold."

*Bierdeman*, 152 Ohio App.3d at 92, 786 N.E.2d 914; *see also Rock of Ages Memorial, Inc. v. Braido*, 2002 WL 234666, *4 (Ohio App. Feb. 8, 2002); *Mid–West Presort*, 1988 WL 17825 at *1.[22] In this case, the non-compete agreements do not contain language indicating that assignability was contemplated. As in *Braido*, the non-compete agreement specifically applies to Exercare and each individual defendant rather than referring generically to their respective roles as employer and employee. Moreover, the geographical restrictions set forth in the agreements are expressly defined in connection with distance from a specific employer—Exercare. This particularity indicates the non-compete agreement was limited to the two parties to the contract and therefore not assignable. *Braido*, 2002 WL 234666, *4.[23]

While it is unassailable that the assignability of the non-compete agreements serve

1,01 Ohio St.3d at 248. In answering this question, *Columber* did not explicitly or implicitly overrule prior case law which established the legal framework for reviewing non-compete agreements.

**21.** Defendants cite one primary case, *Beta LaserMike, Inc. v. Swinchatt*, 2000 WL 262628, *4 (Ohio Ct.App. Mar. 10, 2000), for the proposition that non-compete agreements are presumptively assignable unless their terms expressly forbid assignability. (Docket # 80, at 2). While *Beta* is distinguishable on several grounds, including its application of Massachusetts law, it is also out of step with the bulk of relevant Ohio decisions in its failure to fully consider the intent of the original parties to the contract and the altered burdens on the obligor. *Beta LaserMike*, 2000 WL 262628, at *3–4 (concluding that the trial court erred by not applying Massachusetts law).

**22.** In Ohio, the purpose of contract construction is to give effect to the intent of the parties which is presumed to reside in the language the parties choose to use in their agreement. *Graham v. Drydock Coal Co.*, 76 Ohio St.3d 311, 313, 667 N.E.2d 949 (1996).

**23.** In suggesting that such particularity is Irrelevant to intent, Fitness Experience relies on three cases where non-compete agreements were found to be assignable even though the non-compete agreements purportedly referred to a specific employer. *Artromick*, 143 Ohio App.3d 805, 759 N.E.2d 385; *Beta LaserMike*, 2000 WL 262628; *Bierdeman*, 152 Ohio App.3d at 88 and 91–92, 786 N.E.2d 914. None of these cases advance Fitness Experience's untenable position. *Bierdeman* is inapposite because its determination that the non-compete agreement was assignable was squarely based on the fact that it was contained "within an otherwise valid contract which includes a valid assignment clause." 152 Ohio App.3d at 91–92, 786 N.E.2d 914. As noted previously, *Beta LaserMike* is distinguishable because it applied Massachusetts law, finding that the non-compete agreement was "valid and enforceable under Massachusetts law." 2000 WL 262628, at *3–10. *Artromick* is unhelpful because it did not squarely address the issue of intent and merely concluded that non-competition agreements could be assignable even absent specific provisions governing assignability. 143 Ohio App.3d at 808–10, 759 N.E.2d 385.

to protect, to some extent, the good will of the business being sold, such a broad statement could be made in every single case. The pertinent question, therefore, is whether assignability of the non-compete agreements is *necessary* to protect the good will. Accordingly, courts must consider the nature of the business and the particular employee's position in order to weigh this factor's effect on evincing the parties' intent regarding assignability. *Mid–West Presort,* 1988 WL 17825 at *2 (considering the particular employee's positions); *Braido,* 2002 WL 234666 at *4 (considering the employee's position in conjunction with the nature of the business).[24] With respect to the nature of the business, the importance of non-compete agreements to the protection of the good will of the business sold operates on a spectrum. At one extreme, where assignable non-compete agreements are fundamentally necessary to the continued operation of the business, are businesses which perform unique services and are highly dependent on a few key clients. At the other extreme are businesses which sell malleable goods at several fixed locations to the general public. While the retail specialty fitness stores fall somewhere in between these two polar extremes, they are more akin to the latter such that intent of assignability cannot automatically be assumed from the nature of the business.

Given the importance of the Individual Defendant's positions with Exercare and their respective responsibilities, as regional sales manager, purchasing manager, and store managers, it is reasonable to assume that non-compete agreements would play some role in protecting the good will of the business sold. However, considered in the context of Exercare's business as a retail fitness goods supplier, the non-compete agreements were not necessary to protect the purchaser of Exercare "against employees resigning and taking valued clients with them." *Kethan,* 209 F.3d at 929; *see also Braido,* 2002 WL 234666 at *4. While it cannot be disputed that the non-compete agreements would be of some utility to any purchaser of Exercare, these agreements were not fundamentally necessary to protect Exercare's good will. Even without the non-compete agreements, Fitness Experience still had every opportunity "to make the customers of [Exercare its] own." *Braido,* 2002 WL 234666 at *4.[25]

After cobbling together the express language of the non-compete agreements, considering the particular tendency of these non-compete agreements to protect the good will of the business sold, and strictly construing the agreements in favor of competition and against Fitness Experience, the Court concludes that Exercare and the Individual Defendants did not intend the non-compete agreements to be assignable.[26]

---

24. Defendants frame their analysis of whether assignability of non-compete agreements would protect the goodwill of the business sold by examining how Fitness Experience handled Exercare's assets after the asset acquisition. (Docket # 78, at 5–6; Docket # 79, at 2). However, such an analysis considers the non-compete agreements at the wrong point in time. Because the analysis is directed at ascertaining the intent of the Individual Defendants and Exercare at the time they entered into the agreement, events subsequent to Fitness Experience's asset acquisition are irrelevant.

25. While the very existence of this controversy demonstrates the utility of the agreements to Fitness Experience, it does not serve as definitive proof that the agreements were necessary to protect Exercare's good will. In fact, given the nature of Exercare's business, the agreements served less to protect Fitness Experience from employees taking highly valued clients with them after their resignation than to serve as protection from the vagaries of the free market.

26. Even if the language of the contract contemplates assignment, Ohio courts have further restricted the assignment of non-compete agreements, consistent with *Rogers,* to situa-

b. *Novation*

 Absent an assignable contract, Fitness Experience argues in the alternative that the mere fact that the Individual Defendants worked for Fitness Experience following its asset purchase of Exercare serves as an effective novation of the non-compete obligations. (Docket # 72, at 17–18). "A contract of novation is created where a previous valid obligation is extinguished by a new valid contract, accomplished by substitution of parties or of the undertaking, with the consent of all the parties, and based on valid consideration." *McGlothin v. Huffman*, 94 Ohio App.3d 240, 244, 640 N.E.2d 598 (1994). "In order for a novation to occur, there must be a clear and definite intent on the part of all parties to the original contract that the purpose of the second agreement is to effect a novation; to completely do away with the original contractual obligation." *Wenner v. Marsh USA, Inc.*, 2002 WL 826021, *2 (Ohio App. May 2, 2002). While knowledge and intent need not be express and can be implied from the party's conduct, *McGlothin*, 94 Ohio App.3d at 244, 640 N.E.2d 598, all parties to the original contract as well as the substituted party must assent to the novation. *Frederick C. Smith Clinic v. Lastrapes*, 111 Ohio App. 42, 47–48, 170 N.E.2d 497 (1959). Whether express or implied, evidence of a party's knowledge and consent must be clear and definite, as a novation will never be presumed. *Bolling v. Clevepak*, 20 Ohio

App.3d 113, 125, 484 N.E.2d 1367 (1984); *see also Grant–Holub Co. v. Goodman*, 23 Ohio App. 540, 156 N.E. 151 (1924); *Moneywatch Cos. v. Wilbers*, 106 Ohio App.3d 122, 125, 665 N.E.2d 689 (1995). "As a general rule, in order to effect a novation involving the introduction of a new party, it is necessary that there be a mutual agreement among the parties to the old and the new obligations whereby the new obligation is substituted for the prior one." *Lastrapes*, 111 Ohio App. at 48, 170 N.E.2d 497; *Bolling*, 20 Ohio App.3d at 125, 484 N.E.2d 1367.

 In this case, Fitness Experience has provided absolutely no evidence of a mutual agreement among the parties, including the Individual Defendants, that the Individual Defendants prior non-compete obligations to Exercare be extinguished and replaced by non-compete obligations to Fitness Experience. While it is true that intent to enter into a contract of novation need not be express, such intent cannot be implied from the circumstances of this case. The sum total of Fitness Experience's evidence of intent on the part of Individual Defendants is based on their continued employment with Fitness Experience after its acquisition of Exercare. In essence, Fitness Experience presumes a novation occurred based solely on the Individual Defendants' continued employment. Such a presumption is entirely inappropriate and lays bare the absence of mutual

---

tions where "no additional burdens are placed on the employee as a result of the change." *C.A. Litzler Co. v. Libby*, 1991 WL 160850, *3 (Ohio App. Aug. 12, 1991); *Bierdeman*, 152 Ohio App.3d at 92–93, 786 N.E.2d 914. Moreover, some courts, in line with *Rogers*, have further limited assignment of non-compete agreements to situations where only the legal structure of the business has changed. *Libby*, 1991 WL 160850; *but see Bierdeman*, 152 Ohio App.3d 86, 786 N.E.2d 914; *Artromick Int'l v. Koch*, 143 Ohio App.3d

805, 759 N.E.2d 385. Having found an absence of intent that the non-compete agreements be assignable, the Court need not address these issues.

Similarly, it need not reach the defendants' additional arguments that the agreements were no longer enforceable because the express terms of agreements impose geographical limitations connected to Exercare which are no longer in existence and that Fitness Experience is estopped from enforcing the non-compete agreements due to waiver.

agreement to effect a novation in this case.[27]

### c. Conclusion

Because the non-compete agreements were not validly assigned to Fitness Experience and no novation took place, the Individual Employees obligations under the agreements cannot be enforced by Fitness Experience.

### 2. Breach of Contract (Count I)

■ In its first cause of action, Fitness Experience contends that defendants Stropoli, Ramirez, Adams, C. Longnecker, R. Longnecker, Beatty, and Doyle breached the non-compete agreements each defendant entered into with Exercare. Having found that Individual Defendants' non-compete agreements with Exercare were not assignable to Fitness Experience and that no novation occurred, such agreements are therefore not enforceable by Fitness Experience. Because an enforceable contract is one of the basic prerequisites of a breach of contract claim, *Garofalo v. Chicago Title Ins. Co.*, 104 Ohio App.3d 95, 108, 661 N.E.2d 218 (1995), Fitness Experience's claim that Individual Defendant's breached the non-compete agreements fails as a matter of law.[28]

### 3. Breach of Duty of Loyalty (Count III)

■ In count three, Fitness Experience alleges that defendants Stropoli, Ramirez, and Adams breached their duty of loyalty to Fitness Experience by planning for the creation of TFC Fitness, a direct competitor, while still employed by Fitness Experience. Ohio courts have concluded that an employee "owes his or her employer a duty to act 'in the utmost good faith and loyalty toward his ... employer.'" *Berge v. Columbus Community Cable Access*, 136 Ohio App.3d 281, 326, 736 N.E.2d 517 (Ohio App.1999) (*quoting Connelly v. Balkwill*, 160 Ohio St. 430, 440, 116 N.E.2d 701 (1954)). Ordinarily, this duty of loyalty is breached when an employee competes with his or her present employer. *Berge*, 136 Ohio App.3d at 326, 736 N.E.2d 517; *See also Staffilino Chevrolet, Inc. v. Balk*, 158 Ohio App.3d 1, 15, 813 N.E.2d 940 (2004); *Cary Corp. v. Linder*, 2002 WL 31667316, at *6 (Ohio App. Nov. 27, 2002).

In this case, Fitness Experience has presented no evidence that defendants Stropoli, Ramirez, and Adams competed with it while still employed by Fitness Experience. Although Ramirez, Adams, and Stropoli discussed the possibility of starting their own business, there is little or no evidence that they did so during work hours or on work property. Fitness Experience's evidence is limited to the possible use of a business phone by Ramirez on 9 January 2003 to speak to an insurance agent and a single call by Stropoli on his business cell phone to Ramirez to discuss the possible business venture. (Ramirez at 95–96, Ex. G; Massie Aff. at ¶ 14; Stropoli Dep. at 69–70). Moreover,

---

**27.** Fitness Experience's reliance on the alternative holding in *Safier's v. Bialer*, 93 N.E.2d 734, 738 (Ohio Com.Pl.1950) is unavailing because *Safier's* involved evidence of the parties' intent. In *Safier's*, unlike the present case, the new employer specifically informed the employee that he could continue working "on the basis of his written agreement with the previous owner," which included a restrictive covenant, and the employee, at least initially, accepted employment on those conditions. *Id.* at 735–36. The facts of this case are of a wholly a different nature as the Individual Defendants had no such discussions with Fitness Experience and merely kept working for Fitness Experience after it acquired Exercare's assets.

**28.** While Count I also refers to the non-disclosure agreements executed between Individuals Defendants and Exercare, plaintiff does not argue or put forward any evidence on this issue.

there is little or no evidence that Ramirez, Adams, and Stropoli contacted any of plaintiff's vendors or customers in an effort to establish an independent relationship with while still employed by Fitness Experience. Although Ramirez did discuss the possibility of the new company with two personal friends who were Exercare/Fitness Experience customers, there is no evidence that these general conversations were directed at obtaining commitments from these individuals to do business with the as yet unformed venture or that the conversations otherwise imperiled Fitness Experience's business relationship with these customers. While Ramirez and Stropoli did meet with insurance agents, realtors, and lawyers in conjunction with their planning, such actions were again taken outside work. In short, Fitness Experience has presented no evidence that defendants Stropoli, Adams, or Ramirez competed with it while still employed there. While it has demonstrated evidence that Stropoli, Adams, and Ramirez had discussed the possibility of competing with Fitness Experience and had engaged in some preliminary steps to setting up a competing business, "preparing to compete" is qualitatively different than actually competing with one's present employer and will not, by itself, support a breach of loyalty claim. *Cary,* 2002 WL 31667316, at *6. Accordingly, defendants are entitled to summary judgment on plaintiff's third cause of action.[29]

### 4. Tortious Interference with Contractual Relationships (Count IV)

■ In it fourth cause of action, Fitness Experience contends that defendants TFC Fitness, Stropoli, Adams, and Ramirez tortiously interfered with its non-compete agreements with C. Longnecker, R. Longnecker, Beatty, and Doyle.[30] Ohio law recognizes both the tort of intentional interference with a contract and the tort of intentional interference with a prospective contractual relationship. *Gray–Jones v. Jones,* 137 Ohio App.3d 93, 100, 738 N.E.2d 64 (2000). These torts generally occur "when a person, without a privilege to do so, induces or otherwise purposely causes a third person not to enter into or continue a business relationship with another, or not to perform a contract with another." *A & B–Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council,* 73 Ohio St.3d 1, 14, 651 N.E.2d 1283 (1995).

In this case, Fitness Experience has failed to put forward any evidence supporting this claim. Because the non-compete agreements were not assignable, TFC Fitness' hiring of C. Longnecker, R. Longnecker, Beatty, and Doyle could not even arguably constitute interference with a contractual relationship with Fitness Experience. Moreover, given that C. Longnecker, R. Longnecker, Beatty, and Doyle never discussed employment with TFC Fitness until after the termination of their

---

**29.** Although only plaintiff sought summary judgment on count three, the Court may *sua sponte* grant summary judgment to defendant so long as the plaintiff, as the losing party, "was on sufficient notice that [it] had to come forward with all of [its] evidence." *Grand Rapids Plastics, Inc. v. Lakian,* 188 F.3d 401, 407 (6th Cir.1999); *see also Williams v. Int'l Paper Co.,* 227 F.3d 706, 716 n. 6 (6th Cir. 2000). As plaintiff itself moved for summary judgment on this claim and the claim was fully briefed by both parties, defendant may be awarded summary judgment where, as

here, plaintiff not only failed to establish that it was entitled to judgment as matter of law but also failed to demonstrate the existence of a disputed material fact precluding judgment in favor of the defendant.

**30.** While Fitness Experience also refers to the non-disclosure agreements in its complaint, it advances no arguments based on those agreements in its summary judgment motion or in its opposition to defendants' motion for summary judgment.

employment relationship with Fitness Experience and that they contacted TFC Fitness about possible employment rather than the reverse, Fitness Experience has failed to establish that any business relationship was interfered with by TFC Fitness. Accordingly, TFC Fitness is entitled to judgment as a matter of law on count four of Fitness Experience's complaint.

## IV. CONCLUSION

For the reasons set forth above, plaintiff Fitness Experience's motion for summary judgment is denied and defendants' motion for summary judgment is granted. As a consequence of this ruling, counts one, three, and four of plaintiff's complaint are dismissed and this case will proceed only on counts two (promissory estoppel), five (misappropriation of trade secrets), and six (unfair competition).

IT IS SO ORDERED.